**UNITED STATES of America,
Appellee,**

v.

**Jose MONTALVO, William Rovira and
Rose Rovira, Appellants.**

**No. 38, Docket 25639.**

United States Court of Appeals
Second Circuit.

Argued Oct. 8, 1959.

Decided Nov. 16, 1959.

Stephen E. Kaufman, Asst. U. S. Atty., New York, N. Y. (S. Hazard Gillespie, Jr., U. S. Atty., David Klingsberg, and Otis Pratt Pearsall, Asst. U. S. Attys., New York City, on the brief), for appellee.

Henry G. Singer, Brooklyn, N. Y. (Harry Silver, New York City, on reply brief), for appellants.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This appeal is from judgments, entered after a trial before Judge Dimock and a jury, convicting defendants under a two-count indictment which charged them with receiving, possessing, concealing and facilitating the transportation and concealment of narcotics illegally imported in violation of 21 U.S.C.A. §§ 173 and 174 and with conspiring to violate the same sections. Appellants question the sufficiency of the evidence and allege various errors by the trial judge. We think the evidence was ample to warrant submission to the jury, and we find no errors in Judge Dimock's conduct of the trial.

The prologue to the story told at the trial occurred in the afternoon of September 19, 1958, when a special employee of the Bureau of Narcotics informed narcotic agents that William and

Rose Rovira and Montalvo would meet at the Roviras' home later in the afternoon, that the three defendants would then go to the Bronx to pick up some pure heroin, and that Montalvo would carry this to his apartment for adulteration. The agents set up an extensive surveillance of the defendants with efficiency and dispatch. The results were put before the judge and the jury by a number of agents and employees of the Bureau of Narcotics and also by Montalvo's landlady. Of the three defendants only Montalvo testified.

About 6 p. m. the three defendants left 46 West 83rd Street where the Roviras lived. They were carrying nothing with them. They went to a garage, departed in a car still carrying nothing with them, and drove to the Bronx. En route they made a stop at a butcher shop. Rose Rovira left the car empty handed and returned equally so. Their next stop was a housing project in the Bronx. Rose again alighted, carrying nothing. A few minutes later she came back, carrying a brown paper bag. As she paused on the curb, two Federal agents drove between her and the car. One of them estimated the bag to be eight inches in length and four inches in height and width; he noted also that the neck of the bag had been rolled down to serve as a handle.

Rose entered the car, which drove off. A taxicab driven by a government agent followed it. Shortly the Rovira car stopped. Rovira signalled for a taxicab; the government cab responded. The driver saw Montalvo descend from the Roviras' car, holding a brown paper bag which Rose Rovira had passed to her husband, who had handed it on. Montalvo, with the bag, then entered the government cab. The agent-taxi driver's estimate of the dimensions of the bag was nearly the same as that of the agent who had first observed it. He also noted that the neck had been rolled down to form a handle.

Montalvo gave the agent 11 West 73rd Street as the destination. The agent made a stop on the pretext that he wished to call his wife. Instead he called the Bureau of Narcotics for the deployment of additional agents. Montalvo left the cab at the corner of West 73rd Street and Central Park West. The agent-taxi driver and another agent saw him enter 11 West 73rd Street, bag in hand. A narcotic clerk posted inside the building saw him enter apartment 1A, still with paper bag. Fifteen minutes later Montalvo left 11 West 73rd, without paper bag. He was confronted by two agents who inquired whence he came. Montalvo said he had just come from uptown in a cab and was on his way to meet a girl. He denied having come from 11 West 73rd Street. He was arrested, searched and brought back to the apartment. This was thoroughly searched for the brown paper bag without success. During this search Montalvo removed a lining of brown paper from a bureau drawer. He wrapped this around some shirts in an endeavor to demonstrate to the agents that this was the package he had been carrying. The endeavor failed; for the package of shirts was larger and bulkier than the paper bag, the paper was darker in color and covered with dust, and Montalvo's story that he had carried the package under his arm did not tally with the observations made by the two agents and the narcotic clerk.

While the search of the apartment was in progress, the landlady arrived. She unlocked the outer street door leading to the basement; a first search of the basement and of the rear stairway connecting it with each apartment did not disclose the paper bag. On returning to Montalvo's apartment, the landlady asked for his key to the fire door to the rear stairway leading to the basement. He said it was lost. The agent and the narcotic clerk went again to the basement via the street door, and made a more thorough search. This time they found a brown paper bag containing heroin, hidden at the top of a closet. The agent who had seen Rose Rovira carrying a bag in the Bronx and the agent-taxi driver who had driven

Montalvo confirmed that the bag found in the closet was the same in size and shape as the one they had previously observed.

The agents then obtained a confession from Montalvo by methods which led Judge Dimock to suppress it. Among the items of information yielded by the confession was that Montalvo's fire door key was concealed in a roll of toilet paper in his bathroom. Montalvo accompanied one of the agents who found this. There followed a third trip by the agents to the basement, this time by the rear stairway route, and the discovery, in the same closet where the paper bag had been hidden, of a shirtsleeve containing more heroin and paraphernalia useful for its adulteration and conversion from wholesale to retail size.

About 11:15 p. m. William Rovira drove past 11 West 73rd Street in the same car that had made the trip to and from the Bronx. With the ill fortune that dogged the defendants that evening, he had attracted as a passenger a special employee of the Bureau of Narcotics, who died before the trial. On two occasions Rovira slowed down as he passed 11 West 73rd Street, looked toward the building, but, after a few seconds, resumed speed. Shortly thereafter other agents found Rovira and the special employee in a nearby drugstore. They placed Rovira under arrest. When asked whence he had come, Rovira said he had come straight from home to the drugstore to buy medicine. When taken to the 11 West 73rd Street address and confronted with Montalvo, he said he did not know Montalvo and had never seen him before. A search of Rovira's person disclosed a penknife. The blade of this was caked with a small quantity of heroin.

For the final act we return to the Rovira apartment at 46 West 83rd Street. Rose was apprehended there. Her account of her day's doings was that she and her husband had gone to the Bronx to visit and on the way had picked up a friend of her husband whose name she did not know. She denied knowing Montalvo. Both Roviras repeated this denial at the United States attorney's office on the following morning when all three defendants were present. At the trial Montalvo admitted being with the Roviras on September 19; he testified also that he had known them for about a year.

We think this summary is enough to dispose of defendants' contention of insufficiency of evidence to warrant submission to the jury, and we proceed to the alleged errors at the trial:

■ (1) *The admission in evidence of the brown paper bag containing heroin and the shirtsleeve containing heroin and narcotic paraphernalia, which were found in the basement closet at 11 West 73rd Street.* The admission of these objects is attacked on the grounds that there was insufficient evidence to connect them with the defendants and that their discovery was the result of an illegal search and seizure.

■ The first ground of attack requires little comment. The identity of the bag found in the basement closet in size, color, and shape with the bag that Rose carried from the Bronx apartment, that was passed from Rose to William to Montalvo in the car, and that Montalvo took into the taxicab and from the cab into his own apartment, the absence of any such bag in the apartment, Montalvo's incredible story in regard to the brown paper in his bureau drawer, and his opportunity of access to the basement afforded a rational basis for the jury to conclude that the bag containing heroin found in the basement closet at 11 West 73rd Street was the self-same bag that had first appeared in Rose's hands in the Bronx. The fact that other persons also had access to the basement went simply to the weight of the evidence and not to its admissibility; it was not necessary to exclude all other possibilities in order to establish sufficient authentication to make the bag admissible. See Burris v. American Chicle Co., 2 Cir., 1941, 120 F.2d 218, 222. If the jury could thus reasonably attribute

the paper bag and its contents to the defendants, they could likewise attribute the shirtsleeve containing heroin and narcotic paraphernalia which was found nearby.

■ The trial judge denied defendants' request to suppress this evidence as having been obtained by illegal search and seizure on the ground that motion to that end should have been made before the trial. F.R.Cr.P. 41(e), 18 U.S.C.A. Defendants argue that they come within the exceptions to this requirement where "opportunity therefor did not exist or the defendant was not aware of the grounds for the motion" and that in any event the trial judge should have exercised the discretion confided to him by the Rule to permit the motion to be made at the trial. In support of the former argument, they claim that it was not until the hearing late in the trial with respect to the legality of Rovira's arrest that they learned the agents had been told in the afternoon what defendants had afoot for the evening, an interval affording opportunity to obtain a warrant to search Montalvo's apartment. However, Montalvo's trial counsel could hardly have been so naive as to suppose that all that happened to defendants on the evening of September 19 had occurred by accident. The surprise at the trial must have been to find, not that the government had so much advance notice, but that it had been able to do so much with so little. Throughout the nearly four months between arrest and trial Montalvo's trial counsel must have known that the seized narcotics would be offered. A hearing on a pretrial motion for suppression, to which Montalvo was entitled, F.R.Cr.P. 41(e), would have enabled counsel to develop just how much advance information the government agents had. Moreover, there is much to suggest that the failure to move to suppress in advance of trial was a strategic choice. For, since the bag and the shirtsleeve had been found outside Montalvo's apartment, an unsuccessful motion to suppress would have involved a detrimental admission of ownership or possession of the narcotics—a dilemma with which this Court has declined to sympathize. Connolly v. Medalie, 2 Cir., 1932, 58 F.2d 629, 630. Moreover, although the motion to suppress had been made and denied at an early stage of the trial, it was not renewed after defendants learned of the afternoon interview at which the agents had been alerted. Without passing on the question whether the search was in fact unlawful, we thus find no error in Judge Dimock's refusal to entertain the motion to suppress made at the trial, United States v. Volkell, 2 Cir., 1958, 251 F.2d 333, 336, and cases cited.

■ (2) *Admission of testimony by narcotic agent as to the finding of the key to the fire door.* Appellants contend that the government learned the situs of the fire door key only as a result of Montalvo's coerced confession and that testimony in regard to the finding of the key must therefore be excluded as "fruit of the poisoned tree." Cf. Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 and Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. The government contends that the "poisoned tree" doctrine does not apply to confessions, citing United States v. Bayer, 1947, 331 U.S. 532, 540–541, 67 S.Ct. 1394, 91 L.Ed. 1654, 3 Wigmore on Evidence, 3d ed., § 859, and a statement by Judge Learned Hand in this Court's opinion in United States v. Nardone, 2 Cir., 1939, 106 F.2d 41, 44. While we do not think Bayer at all conclusive, the question sought to be presented by appellants does not arise on this record. For careful examination of the transcript convinces us that Montalvo's trial counsel objected only to the admission of the key, which the government ultimately decided not to offer, and to testimony by the agent that Montalvo accompanied him in the search of the bathroom, which the trial judge excluded, and that, with any reference to Montalvo thus eliminated, counsel acquiesced in the agent's being allowed to testify to the discovery of the key. Having acquiesced in the

trial judge's ruling, Montalvo may not challenge it on appeal, United States v. Easterday, 2 Cir., 1932, 57 F.2d 165. Trial counsel for the other defendants likewise made no objection, and these defendants therefore may not do so now, even if they had standing. Cf. Goldstein v. United States, 1942, 316 U.S. 114, 121, 62 S.Ct. 1000, 86 L.Ed. 1312.

(3) *Admission against William Rovira of the penknife found on Rovira's person after his arrest.* It is claimed that admission of the penknife in evidence violated a rule against admitting evidence of former crimes; that the penknife was found as the result of an illegal search; and, on behalf of Rose Rovira and Montalvo, that even if the knife were admissible against William Rovira, it was not admissible against them and they were not properly protected by Judge Dimock's instruction that the jury should consider this evidence only as against William.

Defendants misconceive the theory of the admissibility of the penknife. The evidence was not admitted to show that since William Rovira had committed another narcotics offense at some unspecified date, he might be supposed capable of committing another one now. The government was seeking to show that Rovira, who had been with Montalvo earlier, was about to rejoin him to carry forward the illegal enterprise. Rovira's possession of a tool whose suitability to that end was made plain by its previous use in a similar one, was relevant to that issue. The fact that evidence which is relevant and not otherwise inadmissible may also tend to show a previous crime does not bar its admissibility, 1 Wigmore on Evidence §§ 215–16 (3d ed. 1940). The trial judge must have wide discretion to determine whether the probative value of the evidence is outweighed by its prejudicial character. McCormick, Evidence, § 157 at 332 (1954). The discretion here was not abused. For if the evidence did not

have a great tendency to lead, it had equally little to mislead. Rovira was not entitled to have the penknife suppressed as obtained by illegal search and seizure. For, apart from any question as to the timeliness of this request, the search was valid as incident to a lawful arrest. 26 U.S.C. § 7607(2); Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. And, even assuming in favor of Rose Rovira and Montalvo that the penknife was not admissible against them, Judge Dimock's limiting instruction gave them whatever protection they required. United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, 269.

(4) *Instructions as to exculpatory statements.* Appellants criticize the instructions of the trial court that the jury might consider defendants' false exculpatory statements "as independent evidence of guilt" and that such statements "are circumstantial evidence of a guilt consciousness and have independent probative value." They claim this left the jury with the impression that it might convict the defendants on the basis of such statements alone. We think that appellants' interpretation of the instructions is untenable and that the instructions complied with the views of this Court. United States v. Smolin, 2 Cir., 1950, 182 F.2d 782, 786. Moreover, no objection was taken to Judge Dimock's charge in this respect and therefore appellants cannot make one now. F.R.Cr. P., 30.

Appellants' contention that the trial judge was bound to make available the entire testimony of one of the agents before the grand jury rather than reviewing the testimony and making pertinent parts of it available, has now been foreclosed by Pittsburgh Plate Glass Co. v. United States, 1959, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323. We have reviewed such other claims as are made by appellants and find them without merit.

Judgments affirmed.