**UNITED STATES of America,**
**Appellee,**

v.

**Ronald Raymond RAVICH and Edward McConnell, Defendants-Appellants.**

**Nos. 438, 439, Dockets 33860, 33861.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1970.

Decided Feb. 6, 1970.

David P. Steinmann, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Edward R. Neaher, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for appellee.

Richard I. Rosenkranz, Brooklyn, N. Y., for defendant-appellant Ronald Raymond Ravich.

Harold E. Heller, Bellmore, N. Y., for defendant-appellant Edward M. McConnell.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and MANSFIELD, District Judge.*

---

FRIENDLY, Circuit Judge:

Ronald Raymond Ravich and Edward McConnell were convicted in the District Court for the Eastern District of New York, after trial before Judge Zavatt and a jury, of bank robbery, bank robbery with the use of a dangerous weapon, and conspiracy to commit bank robbery, in violation of 18 U.S.C. §§ 2113(a), 2113(d) and 371, and were given heavy sentences. The robbery, of a branch of the Franklin National Bank in Long Island City, by three men [1] on May 22, 1968, had netted a cash haul of $337,-496. Extensive pre-trial hearings were held on a motion to suppress evidence seized in two motel rooms in Baton Rouge, Louisiana, where Ravich and McConnell were apprehended some six weeks after the robbery, and with respect to photographic and anticipated in-court identification by the bank employees. The more important points on appeal concern these matters. However, it will be convenient to begin by summarizing the case presented at the trial.

## I.

Five bank employees testified that three men, armed with three pistols and a sawed-off shotgun, committed the robbery. The robbers did not wear masks, and the employees had an excellent opportunity to observe them. Five witnesses unhesitatingly identified Ravich as the leader. Four were positive that McConnell had entered the bank, armed with a pistol; the fifth also identified McConnell but was not positive of the identification. A young man testified that he had seen the robbers emerge from the bank and drive off in a late model white Chevrolet. A woman had observed the robbers switch from such a Chevrolet to a dark car driven by a female whom she identified as the Government's witness Lucy Georger. An FBI agent testified to finding a .38 cali-

---

* Of the Southern District of New York, sitting by designation.

1. Joseph Frederick Wetzel was arrested on June 8, 1968, and charged as one of the perpetrators of the robbery. Several months prior to defendants' trial he pleaded guilty to one count of the indictment. He did not testify.

ber bullet on the floor of the abandoned Chevrolet and a rubber glove at the nearby curb.

Lucy Georger testified that two or three weeks before the robbery McConnell began staying over at the apartment she shared with Ravich; that she heard them plan the robbery; that she had purchased the rubber glove found by the FBI; that the late model white Chevrolet was stolen on the night before the robbery; that, at breakfast the next day, detailed plans for the robbery were settled; that she drove, with Ravich, McConnell and the third robber, to the place designated for the car switch; and that the three robbers drove off in the white Chevrolet and later returned. She described the division of the loot at the apartment and the preparations for flight. After McConnell had picked up his girl friend, Jama Zuber, their itinerary included Washington, D. C., Las Vegas, Los Angeles, New York City (to pick up phony identification papers), Philadelphia, Virginia Beach (where Ravich and McConnell spent two days boiling stolen new bills to give them an older appearance, and dyed or attempted to dye their hair), North Carolina, New Orleans (where McConnell purchased an automobile in the name of James Carroll), and ultimately Baton Rouge. Ravich had instructed her always to carry at least $5,000 in case a get-away was necessary, and Zuber also carried large amounts of money.

## II.

This brings us to the circumstances of appellants' arrests: During the afternoon of July 5, 1968, the manager of a gas station in Baton Rouge, La., reported to the local police department that he had observed a large quantity of currency in the glove compartment of an automobile just leaving the station. Detectives Gill and Alford followed the car until its driver went through a stop sign, narrowly avoiding an accident. The officers stopped the car, which McConnell was driving and in which Zuber was a passenger. McConnell produced a New York driver's license in his own name but was unable to exhibit a registration for the car, which had Louisiana license plates; instead he produced a bill of sale from James Carroll, allegedly his uncle, who was said to be staying at the Travel Lodge Motel. The o fficers took McConnell and Zuber to the police station and McConnell's car was driven there. They sent McConnell's name to a nationally connected criminal identification system and were advised he was wanted for robbery in New York. A consent search of his car revealed two .38 caliber revolvers and ammunition, secreted in two suitcases in the trunk.

Zuber became quite talkative. She told the officers she and McConnell were staying at the Travel Lodge Motel with two persons who were registered as Mr. and Mrs. Thomas Moore but whose real names were Ronald Ravich and Lucy Georger. She confided that McConnell, Ravich and Georger "had pulled a job somewhere" and that a great deal of money was hidden in the motel rooms. Asked for identification, she opened her purse, which was observed to contain a large amount of currency, later counted as $3,582.

About 6:30 P.M., Gill and Alford went to Ravich's motel room, arrested Ravich and Georger as fugitives from New York, and found $5,557 in Ravich's wallet. They did not conduct a search of the room but left two uniformed policemen at the entrances to Ravich's room, No. 317, and the adjacent room, No. 316, which McConnell and Zuber had occupied. The FBI was notified and two agents came to the police station, where Ravich and Georger had also been taken. About 7:15 P.M. one of them called the FBI office in New York and obtained further details of the robbery.

Considerably later in the evening Gill and Alford went to the home of Judge Fred S. LeBlanc of the 19th Judicial District of Louisiana to secure warrants for the search of the two motel rooms. The officers presented affidavits which Judge LeBlanc felt were sufficient to establish probable cause, but out of an

abundance of caution he discussed the facts with them at some length. At the suppression hearing he testified that on the basis of the affidavits and the oral discussion, which he had the officers swear to, he felt that there was not only "probable" cause but "positive" cause, and he accordingly issued warrants to search the two rooms. Upon returning to the station the officers found the FBI agents interviewing McConnell.[2] Around 11 P.M., Gill, Alford, another Baton Rouge police officer, and the two FBI agents executed the search warrants on the two rooms, which were connected by an unlocked door. The search, lasting several hours, disclosed large amounts of money, guns and ammunition.

### III.

Defendants moved to suppress the fruits of the search on the grounds that the warrants did not contain a direction, required by both Louisiana law, La.Code Crim.Proc. art. 163, and F.R.Cr.P. 41 (c), that they might be executed at night, and that the moving affidavits were not "positive" that the property constituting the object of the search was in the place to be searched, a prerequisite under F.R.Cr.P. 41(c) for a direction in a federal warrant that it may be served at any time. Judge Zavatt granted the motion with respect to the search of McConnell's room but denied it with respect to the search of Ravich's on the ground that the latter was incident to Ravich's arrest.

In view of our holdings that Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), is inapplicable to searches prior to June 23, 1969, United States v. Bennett, 2 Cir., 415 F.2d 1113 (1969); United States ex rel. Randazzo v. Follette, 2 Cir., 418 F.2d 1319, (Dec.

4, 1969), the validity of the ruling is governed by the law prior to Chimel. It is unquestionable that if Gill and Alford had searched Room 317 immediately following Ravich's arrest, the search would have been lawful under Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The difficulty lies in the delay of four and a half hours between the arrest and the beginning of the search.

Defendants naturally make much of Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). The Government responds with decisions by courts of appeals which are alleged to recognize an exception to Preston where the search was "part of a continuing series of events which included the original arrest and continued uninterruptedly as lawful police investigation and action." Price v. United States, 121 U.S.App.D.C. 62, 348 F.2d 68, 70, cert. denied, 382 U.S. 888, 86 S.Ct. 170, 15 L.Ed.2d 125 (1965). The Price case itself is rather clearly distinguishable from this one. Some of the articles seized were seen when the defendant was arrested in his car on the street at night and the court refused to find illegality in failure to seize them until the car had been driven to the police station; seizure of an envelope some 20 or 25 minutes later was justified as incident to the arrest of a man who had entered the car in the police parking lot and had reached under the front seat. United States v. Gearhart, 326 F.2d 412 (4 Cir. 1964), where officers who had made an arrest on probable cause postponed a search pending an effort to obtain a search warrant but then failed to submit a proper affidavit, is of dubious value to the prosecution since it antedated Preston.[3] In United States v. Masini,

---

2. In his statement, which was admitted at trial and the legality of which is not questioned here, he claimed that he did not know Ravich, that he and Zuber had borrowed $1,500 from his aunt, and that they had had large winnings at Las Vegas.

3. Also the court's opinion speaks of the officers' having "delayed momentarily." 326 F.2d at 414. Examination of the briefs on the Gearhart appeal indicates the delay may have been more than that but hardly so long as 4½ hours.

358 F.2d 100, 102 (6 Cir. 1966), the delay was only "a matter of minutes." Harris v. Stephens, 361 F.2d 888, 892–893 (8 Cir. 1966), cert. denied, 386 U.S. 964, 87 S.Ct. 1040, 18 L.Ed.2d 113 (1967), may support the Government on its facts but it does not even mention *Preston*.[4] This leaves Arwine v. Bannon, 346 F.2d 458 (6 Cir.), cert. denied, 382 U.S. 882, 86 S.Ct. 175, 15 L.Ed.2d 123 (1965). There, Judge McAllister, writing for himself and Judge Phillips, grappled mightily with *Preston* and held it inapplicable; Judge Edwards was unable to accept the distinctions drawn by his colleagues. The decision, which concerned an automobile, scarcely aids the Government in any event since the majority said that if a man is arrested in his home and "the officers leave the house with the prisoner, they cannot afterward return and search the premises or the place where the arrest was made as an incident to the arrest." 346 F.2d at 469.

 We find it unnecessary to pass upon the trial court's ruling since we believe that under the special circumstances of this case the defects in the warrant were not such as to require exclusion of the evidence seized under them. It is not seriously contested that the warrants were valid authorizations for daytime searches; indeed the showing also met the probative standards of Rule 41 for authorizing a night-time search.[5] Judge LeBlanc must have known that the warrants might be executed at night; that was the very reason why the officers had come to his home. All would have been well if the officers, noting the omission in the warrants, had required the Baton Rouge policemen to maintain their vigil until the sun rose

and had returned to execute the warrants then. We hold that their failure to do so is within both the letter and the spirit of F.R.Cr.P. 52, directing that "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The purpose of the requirement of a search warrant, as the Supreme Court has repeatedly reminded us, is to "assure that the judgment of a disinterested judicial officer will interpose itself between the police and the citizenry," Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969), and Judge LeBlanc accomplished this purpose in full measure. The reason for requiring specific authorization of night searches and for the somewhat higher standard of proof for them imposed by Rule 41, namely, the peculiar abrasiveness of official intrusions at such periods, see Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), is wholly inapplicable to two unoccupied motel rooms with police officers stationed nearby to ensure that they remained as they were. "The Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and the same is true of Rule 41. Indeed delay in executing the warrants until daybreak would not even have affected "substantial rights" in the sense that the delay would have made it possible to remove the seized objects.

Although the draftsmen of Rule 52(a) may not have envisioned its application to an "error, defect, irregularity or variance" of this type, surely there can be no good reason for holding police officers to a standard of perfection while excusing

4. It is unclear from the opinion whether any evidence seized during the delayed search was actually introduced at trial.

5. We therefore need not decide which law governs the validity of the warrant. Compare United States v. Bowling, 351 F.2d 236 (6 Cir. 1965), cert. denied, 383 U.S. 908, 86 S.Ct. 888, 15 L.Ed.2d 663 (1966), and Gillespie v. United States, 368 F.2d 1 (8 Cir. 1966) (dictum) (both holding

state law is sole test where warrants were issued by state judicial officer), with Navarro v. United States, 400 F.2d 315 (5 Cir. 1968) (federal law). See also United States v. Scolnick, 392 F.2d 320 (3 Cir.), cert. denied, Brooks v. United States, 392 U.S. 931, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968) (evidence obtained by state and federal officers without observing procedural safeguards required by state law held admissible in federal prosecution).

errors by judges that do not affect substantial rights. The Supreme Court has warned that "the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. * * * A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). This admonition is peculiarly pertinent to this case where, under the law as it then stood, the officers would have been on safe ground if they had barged in and ransacked Ravich's room immediately after his arrest.

## IV.

■ The pre-trial hearings dealt also with the procedures concerning identification. During the weeks immediately following the bank robbery, the eyewitnesses were repeatedly asked to look through various series of photographs in an attempt to identify one or more of the robbers. On June 3 for the first time they were shown a group containing a picture of Ravich. On that occasion they were asked to step separately into a conference room at the bank, where they were handed a stack of 18 photographs with that of Ravich somewhere in the middle. Each was asked simply whether he recognized anyone. Those who picked out Ravich's photograph were not told that they had selected the "right" picture or the same picture as others.

After McConnell's arrest on July 5, his picture and that of Ravich appeared in newspapers in the New York area. For this reason, the agents postponed any attempt to have the witnesses identify McConnell's photograph until the grand jury hearing in October, some three months later. At that time they were individually shown a stack of eight photographs, including McConnell's, under circumstances no more suggestive than those surrounding the earlier selection of Ravich's photograph. They were also shown the Ravich series again.

While several of the witnesses recalled seeing the photographs in the press, all but one were adamant that their identifications did not rest on that; the one did not make any identification at trial.

The defendants were present during the eyewitness testimony at the pre-trial hearing, having rejected the prosecutor's suggestion that they might wish to absent themselves in order to avoid the "show-up" effect, but they did move from the counsel table to less conspicuous positions in the courtroom. In cross-examining four of the eyewitnesses, Ravich's counsel asked whether they could identify anyone in the courtroom as participants in the robbery; after two had done so, the prosecutor asked the same question of another witness, without timely objection. Four of these five witnesses positively identified McConnell and three Ravich.

The court was thus amply justified in finding that nothing had been done which, under the rule of Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), would taint the in-court identifications proposed to be made at the trial. We could thus dismiss the subject were it not for a novel contention by the appellants, namely that the judge erred in denying their request for a pre-trial line-up.

■ Judicial concern about line-ups has been a facet of the worry that "the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967). Wade and its companion case, Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), were designed to insure that line-ups arranged at the instance of the prosecution should be fairly conducted. The claim that when the prosecution has dispensed with a line-up and has relied on other proper methods of identification the defense is

nevertheless entitled to one, does not appear to have been presented heretofore.[6] While appellants speak in terms of denial of a constitutional right, they have not elaborated on what the right is. Clearly there is no violation of the confrontation clause of the Sixth Amendment; defendants not merely were given full opportunity to cross-examine the witnesses at trial but had the benefit of the pre-trial proceedings in doing so.[7] If the right is thought to be the Sixth Amendment's guarantee to a criminal defendant of "compulsory process for obtaining witnesses in his favor," the argument would put considerable strain on the words and their history. We would likewise not be disposed to hold a line-up to be so essential to the presentation of a proper defense concerning identification that refusal to arrange one on a defendant's request is a denial of due process of law. On the other hand, we can well see how a prompt line-up might be of value both to an innocent accused and to law enforcement officers. A pretrial request by a defendant for a line-up is thus addressed to the sound discretion of the district court and should be carefully considered.[8] Without any attempt at being exhaustive, we think some relevant factors are the length of time between the crime or arrest and the request, the possibility that the defendant may have altered his appearance (as was at least attempted here), the extent of inconvenience to prosecution witnesses, the possibility that revealing the identity of the prosecution witnesses will subject them to intimidation, the propriety of other identification procedures used by the prosecution, and the degree of doubt concerning the identification. We find no abuse of discretion in denying a line-up here.

## V.

Appellants complain of the admission in evidence of two .38 caliber pistols and a box of .38 caliber ammunition found in the trunk of McConnell's car at the time of his arrest, of $3582 found in Jama Zuber's purse, and of $5557 found in Ravich's wallet, as well as of four .38 caliber pistols, ammunition, and $86,310 in cash found in the search of Ravich's motel room, on the ground that they were insufficiently connected with the bank robbery.

While Wigmore considered that legal relevancy denotes *"something more than a minimum of probative value"* he made clear that evidence *"does not need to involve demonstration* or to produce persuasion by its sole and intrinsic force, but merely to be *worth consideration by the jury."* 1 Wigmore, Evidence §§ 28, 29 (3d ed. 1940). Others have taken an even more generous view.[9] The trial

---

6. But cf. People v. Martin, [1956] Ir.Rep. 22 (Sup.Ct.), where the defendant contended that after *improper* out-of-court identification procedures an in-court identification is insufficient evidence to go to the jury unless a proper "identification parade" is held beforehand. The court rejected the contention.

7. The appellants complain that they were not allowed to explore the absence of a line-up on cross-examination. However, they were allowed to bring out that the eyewitnesses had seen the defendants in person only once between the robbery and trial, and that on that occasion, the pre-trial hearing, Ravich and McConnell were the only persons present other than the lawyers and court personnel. The judge was justified in ruling that permitting the defendants to go specifically into the ab-

sence of a line-up would bear no sufficient relation to the strength of the in-court identification.

8. Such a line-up must not be a one-way street; a request for it would constitute a waiver of any objection, almost surely baseless in any event, see 4 Wigmore, Evidence § 1130 (3d ed. 1940), to testimony of a line-up identification on the score of this being only a prior consistent statement.

9. See Preliminary Draft of Proposed Federal Rules of Evidence, Rule 4–01, "'Relevant evidence' means evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence," the Advisory Committee's Note, the articles there cited, and Weinstein and Ber-

judge must weigh the probative value of the evidence against its tendency to create unfair prejudice and his determination will rarely be disturbed on appeal. Cotton v. United States, 361 F.2d 673, 676 (8 Cir. 1966); Wangrow v. United States, 399 F.2d 106, 115 (8 Cir.), cert. denied, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968).

 The guns, ammunition and money come under Wigmore's rubric of "Retrospectant Evidence," §§ 148 and 149–60. Sudden possession of considerable sums of money has long been recognized as relevant to a charge of theft, id. § 154. Here there was evidence that before the robbery appellants were almost without money; that afterwards they divided over $300,000 with Wetzel; that during their journeys they and their girl friends gambled, with stakes as high as $22,000 depending on the turn of a single card; and that the women were instructed to keep large sums on their persons for purposes of a get-away. The considerable amounts of currency found in Zuber's purse and Ravich's wallet and room thus passed any appropriate test of relevancy by a wide margin.

 The guns and ammunition stand on a somewhat different footing. The evidence connecting the guns seized in Louisiana with those used in the robbery was rather attenuated. Indeed, since only three guns were used in the robbery it is perfectly plain that at least half of the proffered weapons were not used there. The case thus differs from United States v. Johnson, 401 F.2d 746 (2 Cir. 1968), and United States v. Baker, 419 F.2d 83 (2 Cir. 1969). If the evidence was offered only to prove that defendants were the sort of persons who carried guns, and therefore were more

likely than most to have committed an armed robbery, it might run afoul of the familiar rules that the prosecution may not introduce evidence of criminal character or generally of the commission of a crime on one occasion to prove the commission of a crime on another. See, e. g., People v. Zackowitz, 254 N.Y. 192, 172 N.E. 466 (1930) (Cardozo, Ch. J.).

 Nevertheless, a jury could infer from the possession of a large number of guns at the date of arrest that at least some of them had been possessed for a substantial period of time, and therefore that the defendants had possessed guns on and before the date of the robbery. See United States v. Consolidated Laundries Corp., 291 F.2d 563, 569 (2 Cir. 1961), and 2 Wigmore, Evidence § 437(1) (3d ed. 1940). Direct evidence of such possession would have been relevant to establish opportunity or preparation to commit the crime charged, and thus would have tended to prove the identity of the robbers, the only real issue in this trial. See Morton v. United States, 87 U.S.App.D.C. 135, 183 F.2d 844 (D.C. Cir. 1950); United States v. Montalvo, 271 F.2d 922, 927 (2 Cir. 1959), cert. denied, 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960). Circumstantial evidence of such possession was therefore also relevant.[10]

 Notwithstanding the relevance of the guns and the ammunition, the trial judge would have been justified in excluding them if he decided that their probative value was outweighed by their tendency to confuse the issues or inflame the jury. He might well have done so in this case, in view of the overwhelming evidence that the defendants were the robbers, the rather small addition which the guns provided, and the undoubted

ger, Basic Rules of Relevancy in the Proposed Federal Rules of Evidence, 4 Georgia L.Rev. 43 (1969).

10. In so holding we reject as untenable the often urged claim that an inference may not be grounded on an inference. See Prudential Ins. Co. of America v. Glasgow, 208 F.2d 908 (2 Cir. 1953); Wigmore,

Evidence § 41 (3d ed. 1940). The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as unduly confusing, prejudicial, or time-consuming, but it does not render the evidence irrelevant.

effect on the jury of seeing all this hardware on the table.[11] However, the trial judge has wide discretion in this area, see United States v. Montalvo, *supra,* 271 F.2d at 927, and we do not find that it was abused here.

### VI.

We can dispose of two contentions of appellant McConnell quite briefly.

The first is that he was prejudiced by the joint trial since this permitted the evidence seized in Ravich's motel room to come in against him, although that seized in his own was not. This forgets that the evidence seized in Ravich's room was admissible against McConnell not because of their joint trial but because of their joint actions, and would thus have been equally admissible in a separate trial. Moreover, in our view, the evidence from McConnell's room should also have been admitted—against both defendants.

Brought before a United States Commissioner in Baton Rouge and represented by counsel, McConnell was advised of the charges against him in the Eastern District of New York and waived a removal hearing. Although he was transported to New York on July 26, 1968, he remained in custody, and it was not until September 10 that he appeared before a Commissioner, who assigned counsel. While the delay was undue, McConnell points to no prejudice; the court suppressed a statement he had given the FBI on August 1, and his lawyer had ample time to prepare his case.

### VII.

The only remaining point that merits mention is a claim that Judge Zavatt should have disqualified himself. During the third day of the pre-trial hearings the judge remembered and disclosed that he owned some 325 shares of stock in Franklin National Bank. This was worth between $10,000 and $15,000 and represented .0072% of the bank's 5,391,-527 shares. He declined to disqualify himself, considering the amount was so small that he did not have a "substantial interest" in the case under 28 U.S.C. § 455.[12]

While we do not disagree with this, in our view his interest in the case was not merely unsubstantial but nonexistent. This was not an action by the Franklin National Bank but a criminal prosecution by the United States. The result could make no difference to the bank or its shareholders. Appellants' real claim must be not that the case was one for mandatory disqualification under the first clause of 28 U.S.C. § 455 but for discretionary disqualification under the last. Apart from the three grounds expressly stated, the statute leaves disqualification to the "conscience of the particular judge," MacNeil Bros. Co. v. Cohen, 264 F.2d 186, 189 (1 Cir. 1959); Weiss v. Hunna, 312 F.2d 711, 714 (2 Cir.), cert. denied, 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073

---

11. Cf. Darling, Scintillae Juris 58 (1877), quoted in 4 Wigmore, Evidence § 1157, at 253 (3d ed. 1940):

 What is called "real evidence"—mostly bullets, bad florins, and old boots—is of much value for securing attention. This is true even when these exhibits prove nothing,—as is generally the case. They look so solid and important that they give stability to the rest of the story. The mind in doubt ever turns to tangible objects. They who first carved for themselves a Jupiter from a log of wood knew very well that the idol could do nothing for them; but it enabled them easily to realize a power

 who could. A rusty knife is now to an English juryman just what a "scarabaeus" was to an Egyptian of old. I have seen a crooked nail and a broken charity-box treated with all the reverence due to relics of the holiest martyrs.

12. "Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein."

(1963), with review limited to abuse of the discretion thus confided, Voltmann v. United Fruit Co., 147 F.2d 514 (2 Cir. 1945). We find no such abuse here.

Affirmed.