UNITED STATES of America, Appellee,

v.

William FERREIRA,
Defendant, Appellant.

No. 86–1603.

United States Court of Appeals,
First Circuit.

Argued Dec. 2, 1986.

Decided June 3, 1987.

Joan Lieberman with whom John Wall, Boston, Mass., were on brief for appellant.

Gary S. Katzmann, Asst. U.S. Atty., Boston, Mass., with whom Mark E. Robinson, Asst. U.S. Atty., and Robert S. Mueller, III, U.S. Atty., were on brief for appellee.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

Appellant William Ferreira stands convicted of unarmed bank robbery of a federally insured bank, 18 U.S.C. § 2113(a).[1] The issues on appeal are (1) whether the district court erred in refusing to suppress, *inter alia,* two firearms, $1,958 in cash (including about $150 in "bait money"), and coin rolls seized from Ferreira after an allegedly unconstitutional "stop and frisk," (2) whether the testimony of an expert witness for the prosecution unfairly prejudiced Ferreira, and (3) whether the introduction of weapons in evidence was reversible error. We conclude that a reasonable view of the evidence supports the suppression ruling. But finding an abuse of discretion as to the third issue, we vacate the judgment of conviction and remand to the district court for a new trial.

*Background*

The testimony of witnesses at the suppression hearing establishes the following. William Cassano, an F.B.I. agent with 13 years of experience, testified that on November 16, 1982 at about 10:25 AM he received a radio dispatch that the Boston Five Cents Savings Bank had just been robbed by at least two white men. One man (whom the government believes is Ferreira) was described to Cassano as slim and 5'10" tall with brown or black curly hair. The dispatcher told Cassano that Ferreira was seen carrying an orange-colored jacket, and wearing dark trousers with a ski mask over his face. Witnesses described the other man (Edwin F. McDonald) as "stocky," 5'7" tall, and wearing sunglasses and a red/white baseball cap.[2]

Cassano knew that several bank robberies had been committed by residents of Charlestown, Massachusetts. While he lacked specific information that the robbers hailed from Charlestown, both Cassano and the officer accompanying him nevertheless decided to investigate. The officers arrived at Charlestown from 10 to 15 minutes after the crime. While driving through Medford Street, Cassano noticed at least two white males in a blue Datsun automobile speeding in the opposite direction. This piqued Cassano's curiosity. The officers chased the car as it fled into the

---

1. Section 2113(a) provides:
   Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association;

\* \* \* \* \* \*

Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

2. McDonald did not stand trial as he pled guilty to the same charge of unarmed bank robbery.

Charlestown public housing project in Medford Street. Cassano testified that he saw, from a distance of 40–50 feet, one of three men exiting the car carrying "some sort of bundle covered by an orange jacket or sweater." The suspects did not obey orders to stop as they escaped into a building with some vacant apartments. The officers entered the building, and proceeded to the rooftop. From there, Cassano noticed that the blue Datsun had disappeared. The agents went back again to search the surroundings for abandoned evidence. This search was unsuccessful. The suspects were nowhere to be found at the time.

About five minutes later (35–40 minutes after the robbery), the officers renewed their investigation of the building, which contained many vacant apartments. As they walked down the stairs, Cassano saw Ferreira come out of Room 725. Cassano testified that Ferreira's physical appearance (tall, slim, with dark hair, and wearing dark clothing) matched the description of one of the bank robbers.[3]

The following is the testimony as to what happened next.

[The prosecutor]

  Q. This individual comes out the door and what happens next?

[The witness]

  A. We [Cassano and state police officer Frank LaSheen] stopped him. I told him, "Hold it. Who are you?" At that point I believe he said, "My name is Joe."[4] At that instance the door opened again and I was distracted by the door opening again.

  Q. The door to apartment 725?

  A. Yes, sir.

  Q. What happened when that door opened?

  A. At that point this individual leaped down the stairs and I yelled at him to hold it. I knew there was an agent, a trooper down at the bottom or standing outside the building, and I yelled to him to stop him.

  Q. Did he stop him?

  A. No, sir, he kept going.[5]

As Ferreira ran past another agent, state police officer James O'Connor—who was standing in the parking lot of 50 Medford Street at that time—heard and recognized Cassano's command to stop Ferreira. O'Connor testified he then issued a similar order to Ferreira, but to no avail. O'Connor chased the suspect, finally stopping and frisking him. This stop and frisk produced the evidence appellant sought to suppress.

In a bench ruling, the district judge found that the agents' "prior information," coupled with the area's reputation for criminal activity, constitutionally justified the two detentions.

*The Fourth Amendment issue*

The fourth amendment guarantees against unreasonable searches and seizures of a person. There is a seizure "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64

---

**3.** Appellant maintains that this description was contradicted by the evidence at trial, and hence, the description was objectively unreliable for the subsequent stop. Normally, "[i]n reviewing the court's refusal to suppress we look only to the record created at the suppression hearing." *United States v. Masse,* 816 F.2d 805, 808, (1st Cir.1987). In any event, we have reviewed the trial transcript and have found no material difference between the description given by eyewitnesses to the robbery and that relied upon by Cassano as a basis for the stop. Neither have we encountered any contradiction between Cassano's testimony at the suppression hearing and at trial.

**4.** On cross-examination, Cassano admitted he was in plain clothing and that he never identi-

fied himself as an F.B.I. agent before detaining Ferreira.

**5.** On appeal appellant emphasizes that, instead of running down the steps, he "walked casually" upon being approached by the plainclothesmen. We *assume* this statement is relevant to the legality of one of the stops. Considering Ferreira's admission that he was "nervous" as he was carrying two weapons, and that he later fled as he left the building, his explanation is not convincing. Thus, a finding by the district court disbelieving Ferreira would not have been clearly erroneous. *See Masse,* 816 F.2d at 809 n. 4.

L.Ed.2d 497 (1979) (Stewart, J., plurality op.). *See United States v. Streifel,* 781 F.2d 953, 960 (1st Cir.1986).

A fourth amendment "stop" is a temporary "seizure" which, because of the governmental interests in crime prevention, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and in crime resolution, *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985), is valid even in the absence of probable cause. *See United States v. Berryman,* 717 F.2d 650, 660 (1st Cir.1983) (en banc), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984); *see also United States v. Quinn,* 815 F.2d 153, 156 (1st Cir.1987) (stating that officers may make brief investigatory stops or seizures upon reasonable suspicion that a person may have committed, is committing, or is about to commit a crime).

In *Terry,* the Court adopted a two-pronged test for evaluating the reasonableness of a stop. A court must examine:

whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879).

The suppression issue in this case relates only to whether, considering the totality of the circumstances, the officers had reasonable suspicion of criminal activity for making the stop in the first place. *See United States v. Cortez,* 449 U.S. 411, 418–19, 101 S.Ct. 690, 695–96, 66 L.Ed.2d 621 (1981); *United States v. Manchester,* 711 F.2d 458, 461 (1st Cir.1983). While objective factors, such as general observations by the officer or an area's reputation for criminal activity can be considered in combination with specific facts about the crime, the objective factors standing alone are insufficient for a stop. *See United States v. Trullo,* 809

F.2d 108, 111 (1st Cir.1987). The key is whether the officers had a *particularized* suspicion of criminal activity. *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695.

### A.   The "Cassano stop"[6]

In *Trullo,* 809 F.2d at 111–12, we upheld a *Terry* stop on the basis of two brief conversations between the driver of a parked automobile and another man, which occurred in an area known for drug activity and prostitution. In this case, the inference of criminal behavior that reasonably can be drawn by an experienced officer from the evidence is stronger than in *Trullo.*

■   Ten to fifteen minutes after the robbery, armed with specific descriptions of the suspects, Cassano witnessed a speeding Datsun go by. He followed it and later saw one of three men flee into a partially abandoned building. One of the suspects was concealing an object with an orange jacket or sweater. The radio dispatcher had told Cassano that a bank robber was seen wearing such a jacket. Knowing the area's bad reputation, agent Cassano could, at this point, reasonably infer, based on his 13 years of experience, that a bank robbery suspect was hiding somewhere in the building. The fact that five minutes later agent Cassano saw Ferreira, who fit the description of one of the robbers, emerge from an apartment in the building provided the necessary "articulable" basis for reasonable suspicion justifying the *Terry-Hensley* stop. *Cf. United States v. Jones,* 619 F.2d 494, 496, 498 (5th Cir.1980) (incomplete and stale description of a bank robbery suspect did not suffice).

### B.   *Ferreira's Flight*

■   Appellant claims that Cassano initiated a *second* stop after Ferreira fled the scene. This allegedly happened by Cassano's yell, "stop him." Ferreira submits, and we agree, that flight from an *unidentified* police officer, as here, is ambiguous

---

6. The Government has not argued that Ferreira's initial detention was *not* a "stop", *i.e.,* a police-citizen encounter involving no restraint on freedom of movement in which the fourth amendment does *not* apply. *See INS v. Delgado,* 466 U.S. 210, 215–17, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1983); *see also Streifel,* 781 F.2d at 957 n. 6.

conduct that could be interpreted as a natural reaction to circumstances and not as a reflection upon defendant's guilt. *United States v. Amuny,* 767 F.2d 1113, 1124–25 (5th Cir.1985); *Jones,* 619 F.2d at 498; *cf. United States v. Bowles,* 625 F.2d 526, 535 n. 12 (5th Cir.1980) (flight has been factored into the reasonable suspicion calculus in cases in which the authority of the pursuer is not "readily ascertainable."); *United States v. Pope,* 561 F.2d 663, 669 (6th Cir.1977) (flight from a clearly identified agent may warrant an investigatory stop).

In *Jones,* a suspect's flight from an unidentified police officer patrolling an area in an unmarked car triggered a stop. The court found that the police had no facts on which to base a reasonable suspicion other than the inconclusive evidence of flight. Accordingly, the stop was illegal. Not so in this case. As stated earlier, Cassano stopped Ferreira when he restrained appellant's freedom to walk away, not when he yelled to him. *See ante* at pp. 3–4. Unlike *Jones,* Ferreira's stop was justified by reasonable suspicion based on articulable facts irrespective of Ferreira's flight.

C. *The "O'Connor stop"*

■ O'Connor testified that Cassano's order to stop Ferreira was the principal basis for conducting the stop and frisk. In *Hensley,* 105 S.Ct. at 682–83, the Court held that, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense ...," then a second officer—without having personal knowledge of such facts—can rely on the "flyer" as a basis for a stop. *See Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971).

Cassano's yell to Ferreira had the same effect as the "wanted flyer" in *Hensley* of transmitting reasonable suspicion for making a stop. *Id.* 105 S.Ct. at 683. Thus, reliance by O'Connor on Cassano's order justified the second detention. We hold

that Ferreira's fourth amendment rights were not violated. We turn next to the evidentiary issues.

*Identification testimony*

The district court conditionally admitted the testimony of William J. Bodziak. The government introduced his testimony to prove identification. It is claimed that one of the Nike sneakers Ferreira was wearing at the time of his arrest had left a shoeprint impression over the teller's counter at the time of the robbery. Because the expert Bodziak testified that it was "possible" but "not probable" that Ferreira's Nike sneakers left that impression, the court excluded his testimony as lacking probative value. Fed.R.Evid. 401.

■ We conclude that the district court did not abuse its discretion in refusing to grant a mistrial. First, the court's finding that the expert's testimony lacked probative value was not clearly erroneous. *See* 1 *Weinstein's Evidence* ¶ 702[02] at 702–13 (1985) (stating that a trial judge has ample discretion in the admission or exclusion of expert evidence, and his decision will be upheld on appeal unless "manifestly erroneous"); *cf. United States v. Hickey,* 596 F.2d 1082, 1089 (1st Cir.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 70 (1979) (no abuse of discretion in admitting expert testimony that hair identifications could have been defendant's). Second, the court gave a strong curative instruction which dispelled any possibility of prejudice from having conditionally admitted the testimony. *See* Fed.R.Crim.P. 52(a) (harmless error).[7] The district judge specifically instructed the jury that:

... the evidence concerning this shoeprint does not rise to the level of certainty that you need to have in criminal cases in that the expert is not able to testify that the print was more probably made by this shoe than any other. Accordingly, I'm going to strike all that testimony and instruct you to disregard it; that is, the testimony of Mr. Bodziak. You can

---

7. Rule 52(a) provides:
   Any error, defect, irregularity or variance which does not affect substantial rights shall

be disregarded.

consider Mr. Rutherford's testimony that he found this shoeprint on the counter, and you may be able to draw inferences at some point from that, but the testimony of Mr. Bodziak and Exhibits 21–A and 21–B are stricken, and you will disregard that testimony and those exhibits in arriving at your verdict in this case.

### The weapons

The government introduced at trial real and testimonial evidence of two weapons seized from appellant upon his arrest, in spite of the fact that Ferreira had *not* been indicted for armed bank robbery. The asserted purposes were to establish Ferreira's identity as one of the bank robbers and to show that he resorted to intimidation during the robbery. Over appellant's well-preserved objections, the district court admitted the weapons, stating that there was "enough association historically between the carrying of guns and the robbing of banks to make this sufficiently relevant." The scope of review is whether the district court abused its discretion. *United States v. Tierney*, 760 F.2d 382, 387 (1st Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

We are faced with conflicting views from the courts of appeals on whether evidence of firearms is admissible in an unarmed bank robbery case. The issue is of first impression in this circuit.

In *United States v. Vosper*, 493 F.2d 433, 435–36 (5th Cir.1974), defendant, as here, was charged with intimidating a teller with gestures suggesting the availability of a gun. Without a specific showing that the defendant carried a gun at the robbery, the Fifth Circuit held that *testimony* showing possession or access to a gun was relevant to the issue of intimidation.[8] The *Vosper* court drew an analogy to *United States v. Ravich*, 421 F.2d 1196, 1204 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970), where the court upheld the admission of a defendant's possession upon arrest of guns and ammunition other

than those used in the *armed* bank robbery.

In *United States v. Laker*, 427 F.2d 189, 190 (6th Cir.1970) (*per curiam*), the court had a narrower view of relevancy. The Sixth Circuit reasoned that, in an *unarmed* bank robbery case, evidence that the defendant had a handgun *upon his arrest* lacked any probative value to an element of the crime. The Sixth Circuit went beyond relevancy and concluded, apparently under Fed.R.Evid. 403, 404, that admitting this evidence would "likely ... induce the jury to speculate as to other bad acts which the accused may have committed." *Id.* at 190.

■ In *armed* bank robbery cases this court has allowed the introduction in evidence of weapons actually *used* during the robbery and those weapons of a similar kind used in preparation of the crime. *United States v. Cepulonis*, 530 F.2d 238, 246 (1st Cir.) *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976). *United States v. Eatherton*, 519 F.2d 603 (1st Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975). Where there is proof that a weapon has been employed in a bank robbery, a district court may permit the introduction of that weapon or a weapon of a similar kind to show identity, *Eatherton*, 519 F.2d at 611, or to corroborate testimony linking defendant to the crime charged. *Cepulonis*, 530 F.2d at 246. Such evidence is relevant "to establish opportunity or preparation to commit the *offense charged*, and thus would have tended to prove the identity of the robbers." *Ravich*, 421 F.2d at 1204 (emphasis added).

As an exception, in cases where the weapons are unrelated to the crime charged, they are relevant as "tools of the trade" to show their necessity for the success of the criminal venture. *See United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976) (involving importation and distribution of narcotics); *United States v. Campanile*, 516 F.2d 288, 292 (2d Cir.1975) (admitting a gun as relevant to

---

8. Taking by intimidation has been defined as "the willful taking in such a way as would place an ordinary person in fear of bodily harm."

*United States v. Bingham*, 628 F.2d 548 (9th Cir.1980), *cert. denied*, 449 U.S. 1092, 101 S.Ct. 888, 66 L.Ed.2d 820 (1981).

intent; defendant had admitted that he took the gun with him and, while it was not used during the theft, "having it along would appear to be a form of criminal insurance for the success of the venture").

■ In this case, the admission of real and testimonial evidence of two loaded weapons seized from Ferreira upon his arrest did not make any fact material to the indictment "more or less probable than it would be without the evidence" Fed.R. Evid. 401. *See Laker*, 427 F.2d at 190. Unlike *Cepulonis* and *Eatherton*, there is no foundation testimony in the record showing that Ferreira had actually carried a gun at the time of the robbery. Mere *appearance* of carrying a gun is not enough for relevancy. *But see Vosper*, 493 F.2d at 435–36. We find that the weapons were irrelevant to the issues of identity and intimidation.

Nor do we find another permissible purpose on which the district court could have admitted the guns. Because there is no proof of actual possession at the time of the robbery, the evidence was not a sort of "criminal insurance" for the success of the venture. *See Campanile*, 516 F.2d at 292. We do not think that, because weapons may be part and parcel of some narcotics importation and distribution cases, they should similarly be admitted in every kind of bank robbery case, particularly one in which the *modus operandi* was characterized by the absence of guns. Finally, we find that the evidence was irrelevant for impeachment purposes. Fed.R.Evid. 404. Ferreira did not open the door at trial to real or testimonial evidence of the firearms. *See United States v. Warledo*, 557 F.2d 721, 726 (10th Cir.1977). In fact, the district court denied his motion in limine and his repeated objections at trial requesting the exclusion of such evidence. While Ferreira testified about the guns as an explanation for his flight, we have no way of knowing whether or not he would have so testified had the motion in limine been granted. Given the prejudicial impact of weapons, it is entirely possible that counsel would have made the strategic decision not to have used this testimony as an excuse for his flight. We hold that the district court abused its discretion in admitting irrelevant evidence. Although we base our decision on relevancy grounds, we also join the *Laker* court in holding that such evidence, even if remotely relevant, would have been unfairly prejudicial to appellant. Fed.R.Evid. 403. We turn next to harmless error analysis. Fed.R.Crim.P. 52(a).

A. *The Government's case*

The Government's theory of the case was that, less than one hour after the robbery, a man having some resemblance to a description of one robber was caught with evidence stolen from the bank. The Government also introduced the guns in an effort to prove identity. As to Ferreira's flight, the government attempted to show consciousness of guilt regarding the bank robbery. It is clear from the evidence, however, that none of the eyewitnesses could positively identify Ferreira as one of the robbers except to testify as to his profile and general physical appearance.

Frances C. Schifone, the bank's branch manager, testified that she saw a white slim man about 5'8"–5'10", in his mid 20's, and wearing an orange jacket and dark pants, as he jumped over the teller's counter and demanded money. Because the robber was wearing a ski mask, all that she could see was "the little bit of hair" underneath that mask. This witness also testified that the robber had stolen $3,258 including "bait money." The serial numbers of the "bait money" were listed both at the bank and at the Federal Deposit Insurance Corporation. She also said that the robber stole some "coin rolls." A customer at the bank had to write his account number over the rolls before being allowed to deposit the coins. Mary Naughton, a bank teller, testified to the intimidation issue. She said that the suspect who jumped over the counter pushed over another teller, and appearing to draw a gun from his pocket, said "give me all your money." She testified that this man seemed to be taller than the man in the lobby. Agent Sylvester Rutherford testified as to the shoeprint impression left over the counter. Although the government attempted, through the testi-

mony of Mr. Bodziak, to make a connection between this footprint and the Nike sneakers seized from appellant, the court correctly excluded it for lack of relevancy. Agent William Cassano testified as to the initial stop and as to Ferreira's similarity to the radioed description. Although Cassano could not say that Ferreira was the man who exited the blue Datsun, he did identify Ferreira as fitting one description and as the man coming out of Room 725. Cassano also testified that, at 3:00 PM—about 4½ hours after the robbery—he obtained a warrant to search that room. Agent Russell J. Horner conducted the search of Room 725 (the apartment of McDonald, an admitted bank robber). This search produced a red/white baseball cap, a pair of sunglasses, $523 in money recovered from a toilet (including "bait" and "mutilated" money), and a key which turned out to be from a bank drawer. The government then introduced the testimony of officer James O'Connor. The officer testified that he seized from Ferreira two loaded handguns, over $1,000 in money, including $151 in bait money, a blue "Barracuda" jacket (which an eyewitness testified McDonald was wearing at the robbery), a pair of white Nike sneakers, and "coin rolls."

## B. *The theory of the defense*

■ The principal theory was that there was a reasonable doubt as to whether Ferreira committed the crime. Ferreira admitted that he knew McDonald. He claimed to have gone to his apartment to obtain payment of a $300 loan, and that McDonald paid him with money which later turned out to have been stolen from the bank. He testified that the other money in his pockets legitimately came from a settlement in a personal injury case. As to the reason for his flight, Ferreira testified that he was nervous of being caught with the two weapons, and not because of consciousness of guilt of bank robbery.

In reviewing for harmless error, we consider pertinent the district court's appraisal of the evidence upon the denial of the motion for judgment of acquittal:

THE COURT: Well, it's certainly not the strongest identification case that ever came down the [p]ike.

[THE PROSECUTOR]: The robber was wearing a ski mask in the bank, your Honor, so with respect to identification, the Court is right, it is a weak identification case.

The fact is, though, there are a number of pieces of significant evidence that tie the defendant to the bank.

\*     \*     \*     \*     \*     \*

THE COURT: Yes, I think the jury could find beyond a reasonable doubt that this defendant was one of the robbers. I agree with you, it's not a necessary inference, but it's a permissible one from all of these circumstances.

[THE DEFENSE]: But only that he knew the money was stolen, not that he was in the bank.

[THE COURT]: No. But you combine the presence of the money with the similarity of description, with the similarity of clothing, *with his possession of two small pistols,* and the fact that within a short time after the robbery he was seen in the company of one of the known robbers. Take any one of those things by itself, I don't think you could support a case, *but you put them together,* and you have a combination of circumstances, which I think would warrant the jury drawing an inference which is supportable beyond a reasonable doubt that he is one of the robbers. (Emphasis added).

We cannot conclude that the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The strength of the admissible, circumstantial evidence is not "overwhelming." *United States v. Hasting,* 461 U.S. 499, 507–09, 103 S.Ct. 1974, 1979–80, 76 L.Ed.2d 96 (1982). Unlike in *Hasting,* where the Court found harmless error, the identification evidence in this case was concededly weak. The exclusion of the firearms evidence might have raised a reasonable doubt as to identification because of the weakness of the other admissible evidence. Most importantly, the district court thought that the

possession of the guns would figure prominently as a critical piece of evidence for the jury to consider in its deliberations. The court's failure to issue a cautionary instruction clearly enhanced its prejudicial impact. *Cf. United States v. Robinson,* 560 F.2d 507 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). The jurors could have made the impermissible inference that "bad men carry guns, and thus, the bank robber is the bad man." We disagree with appellee that the admissibility of the guns could not have swayed the jury into finding defendant guilty. *See United States v. Ouimette,* 753 F.2d 188, 192–93 (1st Cir.1985).

*We vacate the judgment and remand to the district court for a new trial consistent with this opinion.*