**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Arthur L. HERZBERG and Gerald M.**
**Barnes, Defendants-Appellants.**

**No. 76–3657.**

United States Court of Appeals,
Fifth Circuit.

Sept. 12, 1977.

---

Joseph A. Calamia (Court-Appointed), Charles M. Mallin, El Paso, Tex., for defendants-appellants.

John E. Clark, U. S. Atty., LeRoy M. Jahn, Jeremiah Handy, Asst. U. S. Attys., San Antonio, Tex., Frank B. Walker, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

THORNBERRY, Circuit Judge:

Gerald Barnes and Arthur Herzberg appeal their convictions for devising a scheme and artifice to defraud, using the mails, in violation of 18 U.S.C. § 1341. They bring two errors for review: first, that the trial court erred in permitting the government to cross-examine Barnes on the subject of a prior, unrelated civil fraud judgment taken against both Barnes and Herzberg; and, secondly, that the trial court erred in allowing adverse testimony as to Barnes' reputation for truthfulness in the community. Finding no reversible error, we affirm the judgments of convictions.

I.

The evidence adduced at trial, viewed in the light most favorable to the government,[1] painted the following picture.

On September 13, 1972, Barnes purchased 50% of the stock of Bankers Trust Company of Albuquerque, New Mexico (Bankers Trust) in his own name and that of one of his employees, from the sole owner and founder of Bankers Trust, Sterling Wayne Pirtle. At the time of the sale, Bankers Trust owned no assets. Ten days later, however, Bankers Trust issued a financial statement listing assets in excess of $7,000,-000. That financial statement falsely listed assets not belonging to the corporation, and ballooned the values of certain real estate. In fact, Pirtle, who retained a 50% interest in the corporation until December 1972, stated at trial that no assets were placed in Bankers Trust at the time that this financial statement was issued.

Four months later, Barnes acquired the remaining interest in Bankers Trust from Pirtle. Five days later, on January 5, 1973, Bankers Trust issued a second financial statement, this time certified by a Certified Public Accountant. On this second financial statement, Bankers Trust assets were listed in excess of $18,000,000. The January 5, 1973, financial statement was prepared in the office of a Certified Public Accountant, who certified as to its content based on information submitted by Barnes and the corporate attorney. At the time, there was no cash on hand, although the statement reflects a cash balance of $598,-000; there was no million dollar letter of credit from Germany; some of the stock listed as an asset was not owned by the corporation; the corporation did not have complete ownership of the buildings and plants listed in the financial statement; and the real estate reflected as owned by the company was never actually owned by it. Both financial statements formed an integral part in the sales presentation made by Bankers Trust salesmen, who displayed them to potential investors.

In addition, the listing of the Board of Directors contained in those statements was equally false. Each of the shareholders who testified, with one exception, stated that he became aware of his position on the Board only after the listing was printed. One of the individuals listed as a Director had never been introduced to Barnes or Herzberg. All of the members of the Board of Directors who testified at trial stated that they never attended meetings and did not know of any meetings having ever been held; in short, they performed no function for Bankers Trust. The company was run by Barnes and Herzberg.

Barnes acquired Bankers Trust as a tool to raise funds from investors to invest in other projects and to take advantage of New Mexico's lenient regulation of trust companies. To this end, Barnes and Herzberg acquired or created a series of corporations, companies and ventures; among them were the Bay of St. George, a venture to acquire and develop resort land in Mexico; Diversified or Development Management Limited, a company operating an air service, a flight school, and a market for buying and selling airplanes; Molecular Industries, a company developing a door balancer and molecular engine; A&A Sand and Gravel Company; and Maricopa Ventures, a corporation to own and develop real property in Arizona. Most of these corporations and ventures were listed as assets of

---

1. See *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Bankers Trust, even though most of them were never acquired or failed for lack of funds.

The investors were solicited from the general public in New Mexico, Arizona and El Paso, Texas, and their investments ranged from $2,000 to over $100,000. Both the Bankers Trust salesmen and the investors testified that in addition to the falsified financial statements, the following misrepresentations were made: that the investors would receive a guaranteed return on their investment of 12% to be paid monthly, quarterly, or yearly; that the investment was a good one and was safe and prudent; and that the investor could obtain the return of all invested funds upon giving the company a certain period of written notice. In addition to the misrepresentations both in writing and in sales presentations, some of the investors were taken on company-paid trips to view the investments and assets which the company ostensibly owned.

Both Barnes and Herzberg testified in their own behalf denying all the allegations contained in the indictment and much of the evidence presented against them. Basically, the defense consisted of their declarations of their good faith in the organization and operation of Bankers Trust and their assertions that they had relied on the advice of counsel in all that they did.

The two errors of which Barnes and Herzberg complain center not on any of the information going directly to establish the alleged offenses. Rather, the first pertains to a particular line of the government's cross-examination of Barnes, and the second focuses on certain rebuttal testimony concerning Barnes' reputation in Phoenix for truthfulness.

On cross-examination, the prosecutor asked Barnes if he knew a Ruth Vosack during the period when he held a securities license. Barnes replied that he knew Mrs. Vosack, but had not known her when he had his license. Elaborating on the relationship, Barnes stated that he had had some dealings with Mrs. Vosack through Commercial Management Corporation, a corporation owned and run by Barnes and

Herzberg but not involved in the present case. Barnes briefly described the nature of the business relationship, a limited partnership for the financing of insurance premiums, and stated simply that the state had declared the contract to be a security and therefore the parties cancelled it. In response to the prosecutor's question, Barnes denied that any litigation had arisen from the relationship. Then, the prosecutor handed Barnes a document, which was an opinion of the Arizona Supreme Court in a case where Ruth Vosack opposed Barnes, Herzberg, their wives, and a Mr. Tatsch. Further questioning elicited Barnes' statement that he knew very little about the case, but that it had nothing to do with the limited partnership. The prosecutor suggested that the suit was a fraud lawsuit brought by Ruth Vosack against Barnes and Herzberg, which Barnes denied, though hesitantly. It was a suit which Barnes and Herzberg had lost. Then the prosecutor asked Barnes to read aloud the last sentence of the opinion, which revealed that the Arizona Supreme Court affirmed the judgment of fraud.

As might be expected, this line of questioning elicited sharp objection from Barnes' counsel, and a motion for a mistrial. He complained that the government attorney's action amounted to impermissible impeachment of the witness as to a collateral matter. The government countered that it sought to introduce the judgment to impeach Barnes in his denial of the existence of litigation and his denial of the nature of the litigation. The line of questioning, claimed the government, was opened by the defense when defense counsel inquired on direct examination of another witness about the existence and some of the operations of Commercial Management Corporation. As additional justification for admitting the evidence the government claimed that it is relevant to proving Barnes' motive and intent. The trial court ruled that the questioning was proper and that the evidence of the prior judgment was admissible only on the ground of impeaching Barnes as to matters which he answered

falsely or incorrectly. Proof of motive or intent failed to support this action, said the judge, because the battle occurred during cross-examination of a defendant. The trial court issued no limiting instruction on this evidence.

In its rebuttal presentation, the government sought to introduce testimony as to Barnes' reputation in the community (Phoenix) for honesty and fair dealing. On the basis of F.R.Ev. 608(a), the court limited the inquiry to Barnes' reputation for truthfulness. As he asked the question, the prosecutor mentioned that his questioning had been limited by the court. The witness testified that Barnes had a bad community reputation for truthfulness. Barnes' counsel again objected and moved for a mistrial. No limiting instruction was given.

We agree with Barnes that the cross-examination was improper and the evidence was improperly admitted. Nevertheless, we stand convinced that the error was harmless. We see no error in the rebuttal testimony or in the manner of asking the question.

## II.

### A. Evidence of Prior Wrongs

Initially, we note several salient aspects of the challenged line of cross-examination and the introduction of the Arizona fraud judgment. The direct testimony as to the existence, purpose, and history of Commercial Management Corp. came out during defense counsel's examination of one of Barnes' previous attorneys; no question concerning Commercial Management Corp. was asked during direct examination of Barnes. The direct testimony as to the corporation did not mention Ruth Vosack or touch any aspect of any litigation concerning that company's operations. The judgment concerned civil fraud, rather than any criminal conviction. The government made no attempt to develop proof of the facts leading to the judgment.

■ The Federal Rules of Evidence, applicable here, provide several avenues toward the introduction of evidence of prior wrongful acts of a witness. Rule 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

This language prohibits proof by extrinsic evidence even where the prosecutor "inquires into" prior acts on cross-examination. The cross-examining attorney must take the witness' answer. *See United States v. Allende*, 486 F.2d 1351, 1354 (9 Cir. 1973), *cert. denied sub nom. Montoya v. United States*, 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1973). This result is consistent with the long-standing doctrine that a witness may not be impeached with extrinsic evidence as to a collateral matter. Prior wrongful acts not resulting in a criminal conviction ordinarily are "collateral matters." *United States v. Beno*, 324 F.2d 582 (2 Cir. 1963), *cert. denied*, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86; *Globe Life & Acc. Ins. Co. v. Still*, 376 F.2d 611, 614 (5 Cir. 1967); 3A Wigmore on Evidence §§ 1003, 1004 (Chadbourn rev. 1970). A subject such as the one confronting us is not a collateral matter if the witness testified on that subject on direct examination.

■ Here, we face impeachment by extrinsic evidence as to a matter—civil fraud—on which there has been no criminal conviction. The topic, while perhaps cracked open on direct examination of one witness, did not emerge during direct examination of Barnes, and therefore we do not consider this evidence to have been opened by the defense. Accordingly, we view the exchange as impeachment by extrinsic evidence on a collateral matter. In the lan-

guage of Rule 608(b), this is evidence of character for truthfulness proven on cross-examination by extrinsic evidence. The Rule prohibits such an attack.

■ A second possible path emerges from Rule 404(b). Here, evidence of prior wrongs may be introduced to show a party's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. It may not, however, be used to prove that party's character in general. This rule, also preserves a venerable principle of the law of evidence. Where, as here, the evidence seeks to prove intent, our Circuit has set high barriers to weed out marginally probative evidence. As we stated in *United States v. San Martin*, 505 F.2d 918, 921–22 (5 Cir. 1974):

1. Proof of the prior *similar* offenses must be "plain, clear and convincing;"

2. The offenses must not be too remote in time to the alleged crime;

3. The element of the prior [offense] for which there is a recognized exception to the general rule, such as intent, must be a material issue in the instant case;

4. There must be a substantial need for the probative value of the evidence provided for by the prior [offenses]. . . . If all of these prerequisites are satisfied, and if it appears on balance that the need for such evidence outweighs the prejudicial effect it is likely to have, then the evidence is admissible.

*See also United States v. Myers*, 550 F.2d 1036 (5 Cir. 1977); *United States v. Bloom*, 538 F.2d 704 (5 Cir. 1976). Here, there was no attempt to meet these demanding standards. In fact, the introduction of the civil judgment cannot alone prove the facts underlying the conviction. *See* McCormick on Evidence § 318 at 739 (2d ed. 1972). The trial judge correctly disallowed this ground for admitting the evidence of the fraud judgment.

■ Thirdly, evidence of prior wrongs may enter the case as impeachment of a witness, without the restrictions noted above as to relevance to character for truthfulness. Rule 609 permits such evidence to enter as extrinsic evidence to impeach a witness. But such evidence must concern a criminal conviction, and only certain of such convictions may enter through Rule 609. We have no criminal conviction before us, and therefore, can find no passage through Rule 609 for the challenged evidence.

■ We must conclude that the cross-examination of Barnes with the fraud judgment, in the absence of a limiting instruction, constituted error. Though we discern some error here, we do not feel that it compels reversal.[2] Reviewing the case from the perspective provided in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), we stand convinced that the judgment was not substantially swayed by the error, and that the error had but slight effect on the jury. *See also United States v. Arias-Diaz*, 497 F.2d 165, 171–72 (5 Cir. 1974), *cert. denied sub nom. Curbelo-Talvara v. United States*, 420 U.S. 1003, 95 S.Ct. 1445, 1446, 43 L.Ed.2d 761. The evidence of guilt here is overwhelming.

### B. Evidence of Barnes' Reputation for Truthfulness

The government, on rebuttal, produced a witness who testified under F.R.Ev. 608(a) that Barnes had a bad reputation in the community for truthfulness. This appeal contains no challenge to the introduction of the evidence under Rule 608(a). Barnes and Herzberg argue, rather, that the testimony's prejudice to both of them outweighed its probative value and, under F.R.Ev. 403, should have been excluded.[3]

---

**2.** Herzberg claims that the introduction of the civil fraud judgment prejudiced him also because the jury was told that the judgment ran against Herzberg. We need not consider that claim of error because it was not made at trial, and because the error, if any, would be harmless.

**3.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

To reverse the trial court on the basis of excessive prejudice under Rule 403, this court should find a clear abuse of discretion. *See United States v. Augello*, 452 F.2d 1135 (2 Cir. 1971), *cert. denied,* 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122, *cert. denied sub nom. Sciortino v. United States,* 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105. We see no such abuse here as to either defendant.[4]  To strike this simple testimony on this ground would mean that no evidence of community reputation for truthfulness could ever be presented in mail fraud prosecutions.  Of course the testimony hurts, but it is not excessively prejudicial.

Accordingly, the judgments of conviction are AFFIRMED.

---

**4.** Herzberg claims to have been prejudiced by the spillover effect of this testimony.  Like his claim as to the cross-examination, this is raised for the first time in our court.  There being no error, we need not consider this claim further.