**Reginald CARTER, Appellant,**

v.

**Lowell D. HEWITT, Superintendent; John Fuiek, C.O.; Duane D. Pyles, C.O.; and Gilbert Levi, C.O., Appellees.**

No. 79–1423.

United States Court of Appeals,
Third Circuit.

Argued Jan. 7, 1980.
Decided Feb. 27, 1980.

Sally A. Lied (argued), Deputy Atty. Gen., Edward G. Biester, Jr., Atty. Gen., Dept. of Justice, Harrisburg, Pa., for appellees.

James D. Crawford (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.

Before GIBBONS, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

We are called upon to determine whether a letter written by the plaintiff Reginald Carter, a prison inmate, violated the Federal Rules of Evidence when it was read and admitted into evidence at the trial of a § 1983 action brought by Carter against prison authorities. We determine that it did not, and therefore affirm the judgment of the district court in favor of the defendants.

### I.

Reginald Carter is an inmate at the Pennsylvania State Correctional Institution at Huntingdon. He claims that he was severely beaten in the course of a routine "shakedown," or search, of his cell on September 22, 1977 by three prison guards, defendants John Fuiek, Duane Pyles, and Gilbert Levi. On the date of the incident, Carter was housed in Huntingdon's maximum security block as a result of his role in an escape attempt a week earlier in which a guard was seriously injured. Carter brought suit against the three guards and against Lowell Hewitt, superintendent of the prison, under 42 U.S.C. § 1983.

The defendants moved to dismiss the complaint, or, in the alternative, for summary judgment. Supporting affidavits were filed with their motion. The action was referred to a U.S. Magistrate under 28

U.S.C. § 636 (1976). The Magistrate directed Carter to file responsive affidavits, but Carter claimed that he was unable to do so due to the restrictions he was subject to as a maximum security prisoner. Faced with this circumstance, the Magistrate scheduled an evidentiary hearing at the prison, at which time Carter's factual contentions were fully tried.

At the hearing, conducted without a jury on July 24, 1978, Carter presented three witnesses and also testified himself. The three witnesses were inmates housed in cells adjacent to or near Carter's at the time of the alleged beating. They all testified that Fuiek, Pyles, and Levi, the three defendant guards, came to Carter's cell shortly after 2:00 in the afternoon of September 22, 1977, ordered him out of the cell, and proceeded to beat him with batons, flashlights, fists, and feet. They all testified that they could not actually see the beating, due to the restricted visibility from their cells, but that they could hear the blows being landed. Two testified that they never noticed any bruises on Carter as a result of the beating; one testified that he noticed some swelling of Carter's face.

Carter testified to the beating in greater detail. He stated that he was hit on the head three or four times with a flashlight and hit 30–35 times with a baton. He also claimed he was kneed in the face, causing his mouth to bleed. He testified, however, that the only visible signs of the beating as early as a day or two later were a swollen lip and some bruises on the back of his neck; all other injuries, he claimed, were covered by his clothes.

The defense called as witnesses the three defendant guards. They testified that they went to Carter's cell on the day in question for a routine shakedown. Fuiek entered the cell, ordered Carter out, and commenced the search. When Carter left the cell, he grabbed Officer Levi's baton and a struggle ensued. Pyles tried to pull Carter off Levi. Fuiek heard the commotion, left the cell, and demanded that Carter release the baton with the words, "turn it loose or I'll run this [flashlight] through your face." Carter then released the baton, and Fuiek completed his search. All three guards claimed that Carter had not been hit by anyone in any way.

The defense also put in the testimony of prison infirmary supervisor Morgan, that Carter would have shown more extensive injuries if he had been beaten as badly as he claimed, or in the manner that he described.

The incident giving rise to this appeal occurred during Carter's cross-examination. Carter was shown a letter written by one "Abdullah" to a fellow inmate at Huntingdon. Carter admitted that he had written the letter, and also admitted that he had denied writing this same letter when he had been questioned as to its authorship in an earlier prison disciplinary proceeding. Defense counsel asked Carter to read the letter. Carter objected on the grounds of relevance, claiming that the letter had been written six months after the alleged beating. The Magistrate then ordered Carter to read the letter but expressly reserved ruling on whether the letter was admissible. Complying with the Magistrate's direction, Carter read the letter aloud. The letter, which was undated, generally described to its unidentified recipient how to file a complaint charging prison guard brutality.[1] In

1. In its entirety, the letter states:
Dig My Brother!
 Here's some carbon paper to make copies of the complaint you should hook up.
 Make the complaint out like so:
 So & so guards came to my cell on or about (date) and threatened me saying, (whole rap with maybe a little yeast). Say that you said nothing for fear of your life and thereafter you've been suffering from acute tension and headaches.

Put in appeal, via request slip to Deputy Supt. of Operations Kelly—if it was claimed you had a weapon. Say in your request that you had no weapon & that such shank junk was fabricated. Say that you were jacked up by guards & brought to hole and handled very bad by guards. Make complaint of how guards mishandled you.
This is a set up my brother—compile complaints to be used for bullshit courts, possibly news media, and a radio program in Pittsburg [sic] & W.D.A.S. down Philly.

its most significant portion, the letter reads:

> This is a set up my brother—compile complaints to be use for bullshit courts, possibly news media, and a radio program in Pittsburg [*sic*] & W.D.A.S. down Philly. We want to establish a pattern of barbaric brutal harrassment [*sic*] and turn it on these chumps to the max.

Defense counsel suggested that this letter was a direction to file a *false* brutality complaint. Carter claimed that he was only encouraging the filing of a legitimate complaint.

Shortly after the hearing, the Magistrate submitted proposed findings of fact and conclusions of law to the district court. Re-

solving the matter that had been expressly reserved, the Magistrate admitted the letter in evidence as reflecting on Carter's credibility and demonstrating a *modus operandi* on Carter's part of filing false brutality complaints. Relying in part on the letter, the Magistrate recommended that the district court find that no beating had occurred and that judgment be entered in favor of the defendant guards. As to Superintendent Hewitt, the Magistrate recommended that his motion for summary judgment be granted since Carter had neither alleged nor proved that Hewitt had directed or encouraged the beating in any way. The district court adopted the Magistrate's recommendations[2] and entered judgment for the defendants.[3]

---

> We want to establish a pattern of barbaric brutal harrassment [sic] and turn it on these chumps to the max. Write a letter to this dude and explain your problem briefly . . . and ask this dude to come visit you for a rap to aid you in legal affairs:
>
> Charles Vierbach
> 741 Washington St.
> Huntingdon, PA.
>
> Make two or three copies (carbon) of your complaint, legal letters (sealed up in envelope) and request slips! Make sure I get a copy of all your stuff!
>
> Abdullah

2. 28 U.S.C. § 636(b)(1) (1976) provides in pertinent part:

> Within ten days after being served with a copy [of the magistrate's report], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

Carter, who appeared *pro se* before the Magistrate and district court, filed no objections to the Magistrate's report within the specified time period; he claims that he was misled about the need to do so. As a result, the district court conducted no *de novo* factual determinations and simply adopted the Magistrate's recommendations. After the district court's opinion was issued, Carter *did* file objections to the Magistrate's report. The district court then issued a one page memorandum opinion construing Carter's objections as a mo-

tion to reconsider the district court's earlier opinion, and denying it on the ground that all the issues raised in Carter's objections had been considered previously.

We need not consider whether the district court's disposition satisfies the *de novo* review requirement of § 636(b)(1), for two reasons. First, Carter does not raise this issue on this appeal (Carter on appeal *is* represented by counsel); and, second, the sole issue which *is* raised here, admissibility of the letter, presents a question of law as to which our own review is plenary. Thus, we pursue this matter no further.

3. The district court's opinion concluded: "The motions for summary judgment of the Defendants will be granted and the actions dismissed." If this remark is taken as an indication that the Magistrate and district court had dealt with this action as a matter for summary judgment, and had granted judgment to the defendants on the ground that Carter had not raised a "genuine issue as to any material fact," F.R.Civ.P. 56, our appropriate course would be to reverse and remand for trial on the merits, since Carter plainly *has* raised a material dispute of fact. The district court's reference to summary judgment, however, does not reflect what actually occurred. Once Carter informed the Magistrate that he could not obtain affidavits to meet those filed by the defendants, the Magistrate dispensed with the summary judgment proceeding and scheduled a full evidentiary hearing. In his order setting a date for the hearing, the Magistrate wrote:

> It is apparent that a material fact in this case is at issue, that is, whether the Plaintiff was wrongfully beaten as a result of the actions and inactions of the Defendants on September 22, 1977. As a result, an evidentiary hearing must be held before the undersigned

Carter now appeals, challenging admission of the letter on three grounds. First, he claims that the letter constitutes character evidence rendered inadmissible by F.R.Evid. 404. Second, he claims that the letter is extrinsic evidence used to prove bad acts to impeach his credibility, and is therefore inadmissible under F.R.Evid. 608(b). Finally, he contends that, even if otherwise admissible, the letter should have been excluded under F.R.Evid. 403 because "its probative value is substantially outweighed by the danger of unfair prejudice."[4]

The defendants meet none of these contentions in their brief. Rather, in what we must regard as a questionable litigation strategy, they do not argue that the letter is admissible; they argue, instead, that even if admission of the letter constituted error, the error was harmless. If the letter was inadmissible, as Carter contends, we would find it difficult to hold that its admission was harmless. Both the Magistrate and the district court expressly relied, and relied heavily, on the letter in their opinions. Since, however, on our own analysis, we cannot agree with Carter that the letter was inadmissible, we do not reach the defendants' claim that any such error was harmless.

We consider, and reject, each of the three grounds of inadmissibility raised by Carter, in turn.

## II.

### A. The Rule 404 Claim

We believe, quite simply, that the letter is admissible, substantive evidence because it bears on the central factual issue in the case—whether Carter was beaten by prison guards on September 22, 1977. The standard of relevance established by the Federal Rules of Evidence is not high: evidence is relevant if it has "*any tendency* to make the existence of any fact that is of consequence to determination of the action more probable or less probable than it would be without the evidence." F.R.Evid. 401 (emphasis added). A factfinder could reasonably interpret this letter as reflecting a plan on Carter's part to promote the filing of false complaints. A factfinder could further draw the inference that Carter's own complaint about being beaten on September 22, 1977 had been filed pursuant to that plan. Thus, the letter is relevant: it has some tendency to make Carter's assertion that he was beaten less likely to be true than it would be without the evidence. Since the letter is relevant, it is also admissible, unless its admission is otherwise restricted. F.R.Evid. 402.

Carter claims, however, that F.R.Evid. 404(b) constitutes a restriction on admissibility. This rule provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is

---

so that he can render proposed findings of facts and conclusions of law to the Court. All the parties' factual contentions were tried at that hearing; the Magistrate's report makes clear that he was then regarding the case as a matter for final determination on the merits. None of the parties here contend that the hearing was anything less than that. In these circumstances, then, we regard the proceedings below as constituting a final determination after trial, and not a summary judgment disposition. This same view was expressed by the Court of Appeals for the Eighth Circuit in considering a case which reached it in a similar procedural posture. *Nielsen v. Western Electric Co.*, 603 F.2d 741, 743 (8th Cir. 1979).

4. Carter presented none of these three objections to the Magistrate or to the district court; rather, his objection apparently was solely in terms of relevance (on the ground that the

letter was written six months after the alleged beating). Under such circumstances, we generally decline to consider the claims on appeal. This is especially so with regard to the claim based on F.R.Evid. 403; under our recent decision in *United States v. Long*, 574 F.2d 761 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978), a party must specifically request the trial court to determine whether probative value is "substantially outweighed by the danger of unfair prejudice," before the court is required to invoke the rule. *Id.* at 766. As we noted earlier, however, Carter appeared *pro se* before the Magistrate and district court. Recognizing his *pro se* status, we overlook this procedural deficiency, *see, e. g., Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (per curiam), and consider Carter's claims on the merits here.

not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Carter claims that before evidence of his act, solicitation of a false complaint, may be admitted under this rule to prove a *plan* of filing false complaints, there must be much greater similarity between the action solicited in his letter (the filing of a false complaint) and the action taken by Carter (the filing of a complaint charging the defendants with beating Carter on September 22, 1977). We cannot agree; his contention misconstrues both the nature of the evidence introduced and the rule itself.

Federal Rule of Evidence 404(b), in this context, governs attempts to prove the existence of a plan through evidence of a series of acts that conform to the plan. Thus, the rule would be implicated here if the defendants, merely by showing that Carter had filed false brutality complaints on several other occasions, thereby sought to prove that Carter had conceived and implemented a plan of filing such false complaints. This letter does not, however, serve that purpose. Rather, Carter's letter constitutes *direct* evidence of the existence of a plan, in its statement that "[t]his is a set up my brother . . . . We want to establish a pattern of barbaric brutal harrassment [*sic*] and turn it on these chumps to the max."

The difference is critical, and may be demonstrated by a simple example. Assume Carter's letter had stated, instead of its actual content, that "I think we can put these prison guards on the defensive by establishing a pattern of prison guard harassment. I intend doing so by encouraging prisoners to file numerous false complaints against the guards. Pursuant to this plan, I filed a false complaint of a beating by three guards on September 22, 1977." It could not be claimed that rule 404 would require such evidence to be in the form of proof of a series of discrete false complaints, and that in the absence of such proof the letter was inadmissible. And if we add to this hypothetical letter a request to the recipient to file a false complaint himself, it could not be claimed that rule 404 would demand great similarity between the complaint solicited and the complaint filed earlier by the author, before the letter could be admitted into evidence. The reason is clear. In the typical case of proof of a plan under the rule, the trier of fact is asked to infer the existence of the plan merely from proof of a series of similar acts. In such a case, the effectiveness of the proof of a plan depends wholly on the similarity of the acts shown.

By contrast, however, in the hypothetical letter described above and in Carter's actual letter, there is *direct* evidence of the existence of the plan; the letters are strong evidence of a plan even if there is no proof of any complaint filed by the author other than the one at issue in the case, and even if the recipient of the letter is *not* asked to file a false complaint. Since, these letters prove the plans directly and not inferentially, they fall outside the scope of rule 404: the letters are not evidence of other acts used as indirect proof of a plan, but direct evidence of the existence of the plan itself.[5] When there is direct evidence of a plan, admissibility does not depend on proof of a series of highly similar acts. Therefore, Carter's letter must be deemed admissible.

---

5. We do not suggest in our analysis here that the proviso in the second sentence of F.R.Evid. 404(b) would preclude admission of the letter into evidence if Carter had *denied* writing it. Carter's letter was admissible to prove his plan as long as there was adequate, independent evidence of his authorship. Because Carter *has* conceded writing the letter, we do not discuss at length the admissibility of the letter if Carter had not made this concession. We observe, however, that, with a proper foundation, the proviso of the second sentence of rule 404(b) might very well support the admission of the letter into evidence if Carter, instead of admitting his authorship, had denied it.

Carter's admission of his authorship plays a different and more important role when the letter is offered as impeachment, rather than substantive, evidence. *See* part II(B) and note 11 *infra*.

If the hypothetical letters described above are admissible, as surely they are, then so is Carter's; the differences among them go only to probative weight, not admissibility. While some inferences, no doubt, must be drawn from Carter's letter to reach the conclusion that he had a plan of filing false complaints and encouraging others to do so, and that the complaint about the incident of September 22, 1977 was part of this plan, these inferences only render the letter less probative, not less admissible. *See United States v. Ravich*, 421 F.2d 1196, 1204 n.10 (2d Cir.) (Friendly, J.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970).

 Even assuming, however, that rule 404 governs the admissibility of the letter, and that Carter's letter falls within rather than without, the scope of the rule, Carter misconstrues the rule's similarity requirement. In those cases demanding striking similarities between the act in question and the acts sought to be proved as evidence of a pattern, the issue is the *identity* of the perpetrator of the act (generally crime) in question. The typical context is that defendant Jones is charged with crime X, and the prosecution offers evidence of crimes Y and Z, which Jones concedes committing. The prosecution then asks the trier of fact to infer that since crime X is so peculiarly similar to crimes Y and Z, it must have been Jones who committed crime X. *See, e. g., United States v. Goodwin*, 492 F.2d 1141, 1154 (5th Cir. 1974); *Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (D.C.Cir.1964).[6] When the issue is *identity,* it is perfectly proper and, indeed, necessary, to exclude other act evidence unless "it bears such a high degree of similarity as to mark it as the handiwork of the accused." *United States v. Goodwin,* 492 F.2d at 1154. But identity is not an issue in this case; Carter concedes that he both wrote the letter and filed the complaint about the September 22, 1977 beating. The issue is rather what light the letter sheds on Carter's brutality complaint. There is no fear, as in the identity cases, that the factfinder may draw an erroneous conclusion as to the identity of the person who committed a crime or performed an act. There is no need, then, for the "striking similarity" required in the identity cases, and little reason to hesitate to place this evidence before the trier of fact to draw all appropriate inferences.[7] The limitation of the "striking similarity" requirement to cases in which identity is the issue is well made in *United States v. Myers,* 550 F.2d 1036 (5th Cir. 1977). The court there stated:

> The government asserts that the evidence of the Pennsylvania bank robbery was admissible to prove that Myers committed the Florida bank robbery because it exhibits his characteristic *modus operandi.* This is a proper purpose. The probity of evidence of other crimes where introduced for this purpose depends upon both the uniqueness of the *modus operandi* and the degree of similarity between the charged crime and the uncharged crime. Of course, it is not necessary that the charged crime and the other crimes be identical in every detail. But they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person. The more unique each of the common features is, the smaller the number that is required for the probative value of the evidence to be significant. But a number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered sepa-

---

6. These two cases, cited by Carter in support of his position, were decided before the Federal Rules of Evidence were issued. Rule 404, however, is in essence a codification of the common law approach, S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 129 (2d ed. 1977), and these pre-rule cases may be regarded as authority for interpreting the rule.

7. In addition to the distinction represented by the presence of the *identity* issue in the typical rule 404(b) cases, those cases also tend to be criminal prosecutions. Thus, the "striking similarity" required there serves the accused's due process right to a fair trial. In a civil suit such as Carter's, of course, due process considerations are much less weighty.

rately, may be of significant probative value when considered together. . . .

A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind. We have consistently held that for evidence of other crimes to be admissible the inference of identity flowing from it must be extremely strong.

*Id.* at 1045 (footnotes and citations omitted). *See United States v. Powell*, 587 F.2d 443, 448 (9th Cir. 1978).

We reject, then, Carter's contention that there was insufficient similarity between the complaint that he solicited in the letter and the complaint that he filed, to allow admission of the letter under rule 404. We hold that the letter was properly admissible as substantive evidence.

### B. The Rule 608(b) Claim

The Magistrate and the district court found the letter admissible in part because it bore on Carter's credibility in testifying that he had suffered a beating at the hands of the defendants. Carter claims this use of the letter violates the limitations on impeachment set forth in F.R.Evid. 608(b). We disagree.

■ Rule 608(b) provides:

(b) *Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character

for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The principal concern of the rule is to prohibit impeachment of a witness through extrinsic evidence of his bad acts when this evidence is to be introduced by calling *other* witnesses to testify. Thus, Weinstein and Berger describe the extrinsic evidence ban as follows:

Courts often summarize the no extrinsic evidence rule by stating that "the examiner must take his [the witness's] answer." This phrase is descriptive of federal practice in the sense that the cross-examiner cannot call other witnesses to prove the misconduct after the witness' denial; it is misleading insofar as it suggests that the cross-examiner cannot continue pressing for an admission—a procedure specifically authorized by the second sentence of Rule 608(b).

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 608[05], at 608–22 (1978) (footnote omitted).

Similarly, McCormick writes: [8]

In jurisdictions which permit character-impeachment by proof of misconduct for which no conviction has been had, an important curb is the accepted rule that proof is limited to what can be brought out on cross-examination. Thus, if the witness stands his ground and denies the alleged misconduct, the examiner must "take his answer," not that he may not further cross-examine to extract an admission, but in the sense that he may not call other witnesses to prove the discrediting acts.

E. Cleary, McCormick on Evidence § 42, at 84 (2d ed. 1972) (footnotes omitted).

■ Thus, the great majority of the decisions finding violations of rule 608(b) do so when the extrinsic evidence that is chal-

---

**8.** McCormick's statement does not describe rule 608(b) but rather current practice at common law. This portion of the rule, however, simply codifies the common law practice in those jurisdictions that permit bad act impeachment. *See* S. Saltzburg & K. Redden,

Federal Rules of Evidence Manual 312 (2d ed. 1977); 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 608[05], at 608–21 (1978). Thus, McCormick's description of the rule at common law may be used as an aid in interpreting rule 608(b).

lenged is obtained from a witness *other* than the one whose credibility is under attack. When, however, the extrinsic evidence is obtained from and through examination of the very witness whose credibility is under attack, as is the case here, we must recognize that the rule's core concerns are not implicated. There is, however, an even more significant reason for finding no violation of the extrinsic evidence rule here: Carter *did not deny* having written the letter; rather, he conceded his authorship but claimed that the letter was not an effort to encourage the filing of false complaints.

Carter's adoption of the letter, and thus his admission of the act used to impeach him, distinguishes this case from every case where the witness, whose credibility is under attack, has denied the evidence which had been obtained from or through him, thus leading to a holding that the extrinsic evidence rule has been violated. In those cases, the witness has denied, rather than admitted, the acts used to impeach him. The impeachment process thus would have required the examiner to produce additional evidence to refute the witness's denial of the acts charged. Such a process makes apparent the basis for the rule against extrinsic evidence: if refutation of the witness's denial were permitted through extrinsic evidence, these collateral matters would assume a prominence at trial out of proportion to their significance. In such cases, then, extrinsic evidence may not be used to refute the denial, even if this evidence might be obtained from the very witness sought to be impeached. But, as we have observed, Carter's case does not present such a situation.

The impeaching letter with which Carter was confronted was not met by a denial of his authorship. Carter's admission that he wrote the letter distinguishes this case from all cases relied on by him. Carter relies especially heavily on *United States v. Herzberg*, 558 F.2d 1219 (5th Cir.), *cert. denied*, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). In *Herzberg*, two defendants were convicted of using the mails in a scheme to defraud. On cross-examination, the prosecutor asked one of the defendants, Barnes, if any fraud litigation had arisen out of a business relationship he had had with a Mrs. Vosack. In response to Barnes's *denial*, the prosecutor showed Barnes the opinion of the Arizona Supreme Court in a suit brought by Mrs. Vosack against him and others, and asked him to read aloud the last sentence of the opinion. This sentence revealed that the court was affirming a decision below that Barnes had defrauded Vosack. The court held that this line of questioning violated the extrinsic evidence ban of rule 608(b). 558 F.2d at 1222–23.

Thus, the *Herzberg* court found rule 608(b) violated only when the evidence was introduced after Barnes *denied* his bad act. Every other case in which the extrinsic evidence ban has been found violated by evidence brought forth during cross-examination of the witness under attack likewise fits this pattern. In each case, the extrinsic evidence was employed after a *denial* by the witness under attack of the specific instances of conduct. *See, e.g., United States v. Turquitt*, 557 F.2d 464 (5th Cir. 1977); *United States v. Dinitz*, 538 F.2d 1214 (5th Cir. 1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977); *Carlsen v. Javurek*, 526 F.2d 202 (8th Cir. 1975).[9]

---

**9.** In *Turquitt*, the defendant was asked on cross-examination by the prosecution whether he had ever signed a lease under the alias of Eddie Von Blitzen. The defendant *denied* ever having done so. Over objection, the prosecutor introduced into evidence a rental application form and lease for the defendant's apartment, both of which bore the signature Eddie Von Blitzen. The Court of Appeals reversed on this ground. 557 F.2d at 466–68.

In *Carlsen*, the plaintiff brought suit against a doctor, and others, claiming that the doctor's malpractice was the cause of the death of the plaintiff's wife. On cross-examination, the plaintiff testified that his relationship with his wife had been very good. The defendants' counsel then introduced the record of the plaintiff's conviction for assault and battery of his wife. The Court of Appeals ruled that admission of this record of conviction ran afoul of rule 608(b). 526 F.2d at 210.

The sole case analogous to this one, *i. e.,* in which the challenged witness *did not clearly deny* the alleged instances of conduct, *found no violation* of rule 608(b) when documentary proof of those instances was introduced during questioning of the witness. In *United States v. Senak,* 527 F.2d 129 (7th Cir. 1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 758 (1976),[10] an attorney was charged with unlawfully soliciting payment from clients whom he had been assigned to represent in his position of public defender. On cross-examination, the prosecution asked Senak whether he had reported a certain fee on his income tax return. He responded that, if his return did not disclose the fee, then it was solely through neglect rather than intentional wrongdoing. The prosecution then introduced into evidence Senak's IRS records, which revealed that the fee had not been reported.

Senak claimed that this cross-examination violated rule 608(b), but his contention was rejected. While the court's reasoning is not perfectly clear, it concludes that the introduction of the records did not constitute proof of specific instances of conduct through extrinsic evidence, but merely inquiry into such conduct on cross-examination, which is permitted by the rule. *See* 527 F.2d at 145. Thus, no violation of rule 608(b) was found even though the IRS records were utilized and admitted as extrinsic evidence.

■ The distinction noted here between our case and those cases in which the extrinsic evidence ban was found to be violated by evidence brought forth during cross-examination of the witness under attack—that Carter admitted the conduct charged while all other witnesses denied it—provides a sound basis for allowing admission of Carter's letter. The purpose of rule 608(b)'s extrinsic evidence ban, as noted, is "to avoid minitrials on wholly collateral matters which tend to distract and confuse the jury." *United States v. Simmons,* 444 F.Supp. 500, 507 (E.D.Pa.1978). Wigmore similarly describes the rationale behind the common law ban on extrinsic evidence: to prevent confusion of issues through proliferation of testimony on minor matters; and to prevent unfair surprise arising from false allegations of improper conduct. 3A Wigmore on Evidence § 979, at 826–27 (Chadbourn rev. ed. 1970). These reasons for barring extrinsic evidence lose their force when the witness whose credibility is challenged concedes the alleged acts. No issues are confused or time wasted through a *trial* of a collateral matter: no trial is needed since the matter is conceded. The trial judge may exercise control over the degree to which the conceded matters are explored through his power to bar irrelevant or cumulative evidence. F.R.Evid. 402, 403. Nor is there any danger of unfair surprise through false charges of bad conduct. If the witness concedes the matter, we may be confident that the charges were not false.

■ Thus, there is no need in such a case to invoke rule 608(b)'s ban on extrinsic evidence, particularly where, as here, credibility is the critical issue.[11] We conclude,

---

In *Dinitz,* the defense sought to impeach a government witness through introduction of his prior inconsistent testimony at an unrelated trial. The court's opinion does not explicitly state that the witness *denied* that he had offered certain testimony at the earlier trial, *see* 538 F.2d at 1224, but such a denial may be assumed; if he had not testified differently at the second trial and denied his conflicting testimony at the earlier trial, there would be no need to attempt impeachment through use of the earlier testimony.

In both *Dinitz* and *Carlsen,* the trials were conducted prior to the effective date of the Federal Rules of Evidence. However, the courts indicate, implicitly in *Dinitz* and explicit- ly in *Carlsen,* that their results would be the same under the Federal Rules. *See Dinitz,* 538 F.2d at 1224; *Carlsen,* 526 F.2d at 210.

10. In *Senak,* the trial was conducted prior to the effective date of the Federal Rules of Evidence. The court made clear, however, that its result would be the same under the rules. *See* 527 F.2d at 145.

11. The dissent implies that there is some inconsistency between our disposition of the rule 608(b) claim here and the disposition of the 608(b) claim in *United States v. Herman,* 589 F.2d 1191 (3d Cir. 1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979). *See*

then, that the use of Carter's letter for impeachment purposes on cross-examination, and its admission, did not offend rule 608(b).[12]

### C. The Rule 403 Claim

Carter finally contends that the letter should have been excluded under F.R.Evid. 403. Again, we are constrained to disagree.

Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

 This rule cannot help Carter. It does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case. Rather, the rule only protects against evidence that is *unfairly* prejudicial. Evidence is unfairly prejudicial only if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, F.R.Evid. 403. It is unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish," or otherwise "may cause a jury to base its decision on something other than the established propositions in the case."[13] 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 403[03], at 403–15 to 403–17 (1978). A classic example of unfair prejudice is a jury's conclusion, after hearing a recitation of a defendant's prior criminal record, that, since the defendant committed so many other crimes, he must have committed this one too. This is an improper basis of decision, and the law accordingly prohibits introduction of prior convictions to demonstrate a propensity to commit crime. F.R.Evid. 404.[14]

 Carter's letter, while undoubtedly prejudicial to his case in that it resulted in the district court ruling against him, presents no danger of *unfair* prejudice. The letter was offered by the defendants to suggest that no beating occurred on September 22, 1977 and that Carter was lying when he testified to the contrary. This, of course, was the central issue at trial. In a case such as the one here where the witnesses on each side take diametrically op-

---

dissenting op., at 977 ("The discussion of Fed. R.Evid. 608 is particularly disturbing . . . ."). Even the most cursory review of *Herman*, however, demonstrates that there is no cause for disturbance.

We hold here that the extrinsic evidence ban should be relaxed when the witness sought to be impeached *admits* the impeaching act. In *Herman*, we held that the extrinsic evidence ban must be enforced where the witness sought to be impeached had *not* admitted the impeaching act. *See* 589 F.2d at 1195–96. Accordingly, there is complete harmony between our holding in *Herman* and our holding here.

12. Of course, even if we found that the use of the letter as impeachment evidence ran afoul of rule 608(b), we would grant Carter no relief; the letter remains admissible *substantively*, as described above in part II(A) of this opinion.

13. This case was tried to a Magistrate without a jury. Nonjury trials present a much smaller danger of unfair prejudice than jury trials. In light of our analysis above, however, we need not, and do not, rely on the absence of a jury in rejecting Carter's claim under rule 403.

14. The distinction between prejudicial evidence and *unfairly* prejudicial evidence was drawn with care in *Dollar v. Long Manufacturing Co.*, 561 F.2d 613 (5th Cir. 1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). The court there stated:

> In this case, the plaintiff sought to use the warning letter for impeachment purposes. While we are aware that Rule 403 authorizes the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, we do not think this situation called for its application. In the face of Saunders' testimony as to his present opinion of the safety of the backhoe when attached to a rollbar-equipped tractor, we do not think *unfair* prejudice to the defendant would have resulted from his having been confronted by his own letter warning of exposure to death by such use. Of course, "unfair prejudice" as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be "unfair."

*Id.* at 618 (emphasis in original). The court reversed the district court's decision to exclude the letter and remanded the case.

posed positions, the factfinder's task is to determine which witnesses are more credible. If the Magistrate, after hearing the letter read, drew the inference that Carter was lying, it cannot be claimed that this was an improper basis of decision. It was, rather, a use of properly admitted evidence which, together with other evidence in the case, resulted in a decision on a proper basis. Thus, Carter has made no showing of unfair prejudice: he cannot demand exclusion of the letter under rule 403.[15]

### III.

Because the dissenting opinion largely addresses subjects which we do not find relevant to our disposition, we feel obliged to record our observations on these matters. The dissent apparently takes no real issue with any aspect of the analysis set forth in part II, above, but notes only that: "Although I do not discuss in detail the several theories on which the majority finds the letter admissible, my silence should not be construed as acquiescence." At 977. Yet, our reading of the dissent reveals to us that, in fact, there is *no* disagreement with our holding that the letter is admissible. It is conceded by the dissent that *its own* hypothetical letter, set forth in its opinion at page 977, is admissible. Yet the differences between the dissent's hypothetical letter and Carter's real one, like the differences between *our* hypothetical letter and the actual one, go only to probative weight, not admissibility.

The main thrust of the dissent does no more than urge a reversal of the district court on a ground not raised. Essentially, the dissent's point is that the Magistrate erred in not allowing Carter to call as a witness the individual to whom the letter was addressed. Our review of the record compels us to disagree.

 When Carter was presented with the letter during his cross-examination, and before he was directed to read it, Carter objected to the letter's relevance. It was at that time, and that time only, that Carter asked to call the recipient as a witness. Recognizing the potential validity of Carter's relevance objection, the Magistrate *at that time* denied Carter's request, since the letter had neither been admitted in evidence nor read aloud by Carter. The Magistrate stated: "I don't think his [the recipient's] statements will be particularly relevant and I'm not certain at this juncture, Mr. Carter, that this document is relevant." After extensive discussion of the letter during Carter's cross-examination, in which its relevance was made clear, the Magistrate then asked Carter whether he wished to make any other statement. Carter responded "No." Neither at this time nor at any other time did Carter ever renew his request to call the recipient of the letter. Under these circumstances, then, it is clear that Carter's failure to call his witness to explain the meaning of the letter cannot be charged to the court.

In not renewing his request, it may be that Carter recognized what our reading of the record reveals: that no innocent interpretation of the letter is plausible. When questioned by the Magistrate as to the significance of the statement in the letter that "[t]his is a set up my brother . . . . We want to establish a pattern of barbaric brutal harrassment [sic]," Carter himself could only offer the patently questionable explanation that it referred to a "set-up" of *inmates* by the *guards* (tr. at 70).

### IV.

We conclude that all three grounds urged by Carter on this appeal, whereby he would have us hold that the district court erred in considering his letter as a matter of evidence, are without merit. We will therefore affirm the October 31, 1978 judgment entered for the defendants and against Carter. Costs will be taxed against the appellant Carter.

---

**15.** As earlier stated, because of Carter's *pro se* status, we have not held him to the requirement of specific invocation of rule 403 articulated in *United States v. Long,* 574 F.2d 761 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). *See* note 4 *supra.*

GIBBONS, Circuit Judge, dissenting.

I respectfully dissent. My disagreement with the majority on the appropriate legal precepts stems, in part, from their reliance on an incomplete version of the facts. Without being too repetitious, I deem it necessary to set forth a complete version.

## I

In his amended complaint, Carter alleged that three of the defendants, Fuiek, Pyles and Levi, wrongfully beat him on September 22, 1977, during a "shakedown" of Carter's cell in Huntingdon's maximum security unit. Carter was placed in the maximum security unit, the Behavioral Adjustment Unit (BAU), because of his participation in an attempted escape which had involved the holding of several guards hostage, one of whom was seriously injured. Carter also seeks to hold the Superintendent of the institution, Hewitt, liable in his official capacity as supervisor of these correctional officers.

The district court referred this matter to the Magistrate "[t]o hear, submit, and file proposed findings of fact and recommendations for the disposition of the matter with the court . . . ." 28 U.S.C. § 636(b)(1)(B) (Supp.1979).

The defendants moved for dismissal or in the alternative, summary judgment, and filed supporting affidavits. Pursuant to Rule 56, Fed.R.Civ.P. 56, the Magistrate advised plaintiff to file affidavits that demonstrated the inappropriateness of summary judgment. A hearing was held on July 24, 1978, at which time, plaintiff presented three witnesses, all of whom were fellow inmates of Carter's.

The procedural posture of this case is not a model of clarity. The Magistrate recommended to the district court that (1) defendant Hewitt's motion for summary judgment be granted on the ground that even assuming the allegations to be true, no legal claim existed because it was not alleged that

Hewitt directed any beating or that the beating was a result of his actions; and (2) that defendants Fuiek, Pyles and Levi's motion to dismiss be granted based on his proposed findings of fact which correlated with the defendants' testimony. However, in adopting the Magistrate's report, the court specifically disposed of the case under Fed.R.Civ.P. 56, rather than under Fed.R. Civ.P. 12 or Fed.R.Civ.P. 53(e)(2). *Carter v. Hewitt*, Civ.No. 77–1168, slip op. at 2 n. 1, n. 1 (Oct. 13, 1978). Such a disposition, at least with respect to Fuiek, Pyles and Levi, is inconsistent with the Magistrate's report. It is apparent that there are material facts at issue with respect to them, and thus the three guard defendants are not entitled to summary judgment as a matter of law.[1] Moreover, it is quite clear that the district court never saw a transcript of the testimony to which the majority refers, because that transcript was not prepared from an electromechanical recording until this court ordered it after the notice of appeal was filed, nor is there any affirmative evidence in the record that the district court listened to the recording. In any event, the order was a form of final judgment, reviewable by this court under 28 U.S.C. § 1291 (1976). This court granted Carter's motions for leave to proceed *in forma pauperis* and for appointment of counsel.

## II

Because this appeal presents an evidentiary question, a brief review of the testimony is necessary. Carter's witnesses testified to having heard the defendant guards beating him, although they never actually saw anyone strike Carter. There was testimony to the effect that the visit was a "shakedown"—a search of Carter and his cell; that Carter asked for medical aid; and that Carter was threatened with incarceration in the glass cage (cells surrounded by a glass wall for additional scrutiny) if he sought medical advice. One witness, McCoy testified that he heard Carter say he

---

1. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

had a bloody mouth and another witness, Castle, testified that when he first saw Carter 36 hours later, Carter's face was swollen. There was contradictory testimony by plaintiff's witnesses as to whether the sounds of the beating could be identified as a beating by fists or by a baton or flashlight.

Carter testified that the defendant guards ordered him outside of his cell for a shakedown and that once out of his cell, they began to beat him. He testified that he was struck by Pyles' baton and fists seven or eight times in the ribs, and that defendant Levi hit him with his baton 20–25 times on his collar bone. He stated that when he attempted to grab Levi's baton, Levi kicked him in the mouth, thereby causing his mouth to bleed. Carter also stated that Fuiek struck him three or four times with his flashlight in the back of the head. He reiterated that he was threatened with the glass cage if he asked for medical attention. He stated that his only noticeable injury was his bloody lip because his clothes covered all his other injuries.

All three defendant guards testified that they had entered Carter's cell for a routine inspection and that no beating was administered to Carter on that day. Instead, each stated that when Carter came out of his cell he grabbed Levi's baton and a pulling contest ensued. Pyle testified that he pulled Carter off Levi, but never struck him. Upon hearing the commotion, Fuiek testified that he came out of the cell and threatened to put his 18″ flashlight through Carter's face if Carter did not let go of Levi's baton. At that point, Carter released his hold on the baton. The guards stated that they did not file an "incident" report because no blows were struck and it was not so extraordinary as to require such a report. All three deny striking Carter and don't recall Carter asking for a doctor.

Defendant Hewitt, the superintendent, testified that there is a procedure for filing inmate complaints and Carter had never filed one. Hewitt recalled that Carter had often mentioned alleged harassment by staff and a lack of medical attention. However, Hewitt did not recall that Carter made any specific claims about a beating on September 22, 1977, although Carter claims he did so inform Hewitt. Moreover, Hewitt stated that he generally has directed the guards not to use force until absolutely necessary and he has no knowledge that any civil or criminal actions have ever been successfully concluded against defendants.

Morgan, the infirmary supervisor, testified that on the day in question he conducted his usual daily inspection of the BAU.[2] He stated that Carter had not filed any "sick reports" and that although he cannot recall whether or not he spoke to Carter that day, he did not view any bruises or injuries on any subsequent days, and that no fellow inmates informed him that Carter was in need of treatment. This testimony is not inconsistent with Carter's version of his attempt to file a report and that most of his injuries were covered by clothing.

The Magistrate and district court essentially were presented with the question of whether Carter did or did not suffer an unlawful beating on September 22, 1977. There was certainly ample testimony for the Magistrate to make such a factual determination. However, on the basis of the letter that Carter had written, the focus of the case incorrectly shifted to the issue of whether or not Carter had fabricated this brutality complaint.[3] Carter's contention is that admission in evidence of this prejudicial letter was reversible error. I agree.

III

On cross-examination, Carter was shown a letter that he had written to a fellow prisoner on March 15, 1978. The Magis-

---

2. Apparently the inmates have not been informed of the medical procedure because they disagreed as to whether the infirmary supervisor visits the BAU every morning to administer medical care or only visits on an irregular basis to respond to sick reports specifically filed by inmates.

3. The letter is quoted in full in the majority's opinion. See Maj. Op. at 964–965 n.1.

trate made a specific finding of fact that the letter was written on March 15, 1978, six months after the alleged beating. The majority opinion implies that the date is a disputed issue by stating that Carter objected, "*claiming* that the letter had been written six months after the alleged beating. . . . The letter, *which was undated*, generally described to its unidentified recipient how to file a complaint charging prison guard brutality." Maj. Op. at 964 (emphasis added). The fact that the letter was written six months after this suit was commenced is important to an analysis under any of the three rules on which the majority relies to justify its admission. Moreover, the majority's reference to an "unidentified prisoner" is incorrect. The prisoner to whom the letter was written was present in the courtroom, and Carter asked if he could call him as a witness. The Magistrate denied the request, and the prisoner, who had been identified by name, was never called as a witness even after the letter had been admitted.

Carter, who was without counsel, objected to the admission of the letter. The Magistrate reserved decision on its admissibility, but instructed Carter to read it aloud from the witness stand. Carter testified that he had written the letter because a fellow prisoner had been abused and needed advice on how to proceed. He denied that he was recommending that the prisoner file a false complaint.

The Magistrate determined that whether Carter had been beaten was a matter of credibility and resolved the credibility issue against him. The Magistrate found that the letter was an attempt by Carter "to have his fellow inmate fabricate an alleged beating, similar to the one that [Carter] has alleged here. . . ." App. 15a. Although the Magistrate listed other reasons for rejecting Carter's story, it is evident that the letter was a crucial part of determining Carter's credibility. The Magistrate held that the letter was relevant to Carter's *modus operandi* and credibility, without stating which evidentiary rules might be applicable.

The district court, in adopting the Magistrate's report, also relied heavily on the letter and quoted the following portion of it as highly relevant to the issue of credibility and falsification:

> This is a set up my brothers—compile complaints to be used for bullshit courts, possibly news media, and a radio program in Pittsburgh & W.D.A.S. down Philly. We want to establish a pattern of barbaric brutal harassment and turn it on these chumps to the max.

App. 20a. The district court cited no additional reasons for the letter's admissibility. Although tape recordings were made of the Magistrate's hearing, as noted above they were not transcribed until the case arrived here, and there is no indication that the district judge listened to them. In light of the reliance by both the district court and the Magistrate on this letter, I cannot accept the appellees' contention that if its admission was legal error, that such error was harmless. Moreover, it is significant that appellee's brief does not contend that the letter was properly admitted. Instead, they state that "[a]lthough an argument can be made that it was proper for the district court to admit the challenged letter, the dispositive issue of this appeal is whether the district court, even if it erroneously admitted the letter, committed reversible error."[4] The majority does not accept the harmless error contention, but it has constructed for the appellees several theories of admissibility which those parties never urged. Indeed, referring to the appellees' "questionable litigation strategy," they advocate several theories of admissibility on behalf of those parties. In doing so, however, they disregard completely the obvious explanation for the appellees' litigation strategy. That explanation is that the record discloses the exclusion of evidence bearing critically on the probative value of the letter for any of the purposes for which the majority deems it admissible.

The majority construes the letter as admissible (1) because it is an admission of a

---

4. Brief for Appellee at 17.

conspiracy to cause the filing of false charges, (2) because if it evidences such a conspiracy it bears upon the credibility of Carter's testimony as to the September 22, 1977 events, and (3) because if it is evidence of such a conspiracy it is evidence that the complaint about the September 22, 1977 events was part of a plan or scheme, or suggests a *modus operandi*. I do not find it necessary to review in detail the labored effort by which the majority manages to relate a letter written in March 1978 to an event which transpired in September 1977. I merely note that if the connection was self evident establishing it would not require so many words. If the letter said

> "I am a member of a conspiracy to file false charges, and the charge filed in September 1977 was made pursuant to that conspiracy",

it would be admissible on all the grounds on which the majority relies. But the letter does not read that way. Rather the majority interprets it as if it was so intended and so understood. It instructs another as to the manner of making a complaint. Carter contends that it was addressed to an inmate who had suffered a beating, as the result of an inquiry from that inmate with respect to legal redress. If the beating and the inquiry took place, then the letter simply cannot have the relevance which the majority attributes to it for any of the three purposes relied upon.

The record is clear that the Magistrate, before he ruled on admissibility, excluded testimony by the addressee which, according to Carter, would have explained the true context of the letter. After the case was closed the Magistrate admitted the missive, and Carter never was given the opportunity to put in evidence of the circumstances surrounding its preparation. We do not know whether the Magistrate, had he heard the testimony of the addressee, who was available in court, would have given the letter an innocent connotation. We do not know that the district court, had the addressee's testimony been recorded and had he listened to it, would have done likewise. But apparently the majority is convinced that, even if the addressee had fully confirmed Carter's innocent explanation, they would not credit that explanation or his version of the September 22, 1977 events.

Although I do not discuss in detail the several theories on which the majority finds the letter admissible, my silence should not be construed as acquiescence. The discussion of Fed.R.Evid. 608 is particularly disturbing, especially considering that its author joined in the disposition of the Rule 608 issue in *United States v. Herman*, 589 F.2d 1191, 1196–98 (3d Cir. 1978). Suffice it to observe that on any theory of admissibility the court would be required before ruling to listen, at least, to evidence which might give meaning from the surrounding circumstances to an inherently ambiguous document.

I would affirm the judgment appealed from insofar as it grants summary judgment in favor of defendant Hewitt, since there is no evidence connecting him to the alleged beating. I would reverse and remand insofar as it dismisses the complaint against Fuiek, Pyles and Levi.